803 A.2d 1146

IN THE MATTER OF THE LICENSE OF ANDREW T. FANELLI, D.O., TO PRACTICE MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY.

Argued March 26, 2002—Decided August 13, 2002.

*Jonathan L. Goldstein* argued the cause for appellant, Andrew T. Fanelli, D.O. (*Hellring Lindeman Goldstein & Siegal,* attorneys; *Mr. Goldstein* and *Robert B. Rosen,* on the briefs).

*Sandra Y. Dick,* Senior Deputy Attorney General, argued the cause for respondent, New Jersey State Board of Medical Examiners (*David N. Samson,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Beatrice Michelle Albertson,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

Dr. Andrew T. Fanelli, D.O. (Fanelli) pled guilty to conspiracy to unlawfully abstract and convert funds of an employee benefit plan to his own use in violation of federal law. In a subsequent license revocation proceeding before the New Jersey State Board of Medical Examiners (Board), Fanelli's request for a full hearing on the issue of the appropriate sanction was rejected. The Board

then revoked his license to practice medicine and surgery in this State. The Appellate Division affirmed.

We find that Dr. Fanelli has a statutory right to a hearing. We therefore reverse the Appellate Division and remand the matter to the Board for further proceedings.

I

In 1991 and 1992, Fanelli, a physician licensed in New Jersey and Pennsylvania, was a partner in a medical practice known as Regional Gastroenterological Associates, P.A. (RGA). Fanelli and his partner, Dr. John Kravitz, were co-administrators of the pension fund for RGA. The fund contained approximately $1.5 million, of which $800,000 was attributable to Fanelli, $560,000 to his partner, and $85,000 to their employees. The RGA pension fund is a fund within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 *U.S.C.A.* § 1001 to 1461.

Fanelli's wife was RGA's bookkeeper and business manager. Mrs. Fanelli informed her husband that RGA had a cash flow shortage and recommended that RGA borrow money from the pension fund. She advised him that this practice was permitted under the law and that she had obtained prior approval for the loan from Dr. Kravitz and RGA's accountants. Fanelli gave his consent and approved the loan.

Fanelli claimed that without his knowledge his wife subsequently sought and received the approval from Dr. Kravitz for three additional loans totaling approximately $1,000,000. The amounts withdrawn by Mrs. Fanelli exceeded the legal limit fund administrators are authorized to borrow from a pension fund. See *I.R.C.* § 401(a)(13)(A); *Treas. Reg.* § 1.401(a)–13(d)(2). The record indicates that Mrs. Fanelli's withdrawals depleted virtually all of the money in the fund. Fanelli contends that he later learned that at the time of the pension withdrawals his wife was suffering from a mental illness that manifested itself in pathological and reckless spending. Fanelli did not personally withdraw any money from the pension fund.

After discovery of the withdrawals, the beneficiaries of the pension fund sued RGA's accountants for malpractice. In 1996, the accountants settled with the pension fund beneficiaries for $900,000. As a result of that settlement the fund was reimbursed, except for Fanelli's interest in the fund. In 1996 and 1997, Fanelli repaid the plan those amounts that had not been repaid through the settlement proceeds, thereby fully reimbursing the fund.

In December 1997, the United States Attorney for the Eastern District of Pennsylvania indicted Fanelli and his wife for breach of their fiduciary duties in administering the pension fund. Although Fanelli claims that he did not have any knowledge of the improper actions, as administrator of the fund, and therefore a fiduciary, he was presumed to have at least constructive knowledge of the wrongdoing. An ERISA fiduciary is subject to a reasonable person standard of care in respect of the employee benefit plan with which the fiduciary is associated. See 29 *U.S.C.A.* § 1104(a)(1); 1105(a)(2).

In December 1998, Fanelli pled guilty in the United States District Court for the Eastern District of Pennsylvania to the indictment charging him with conspiracy to unlawfully abstract and convert funds of an employee benefit plan to his own use, in violation of Title 18, United States Code, Section 371 (Count One) and engaging in a monetary transaction derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957 (Count Four). Fanelli then withdrew his guilty plea and entered a plea of guilty to Count One of the indictment only. The statute under which defendant pled guilty—the federal conspiracy statute—provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

[18 *U.S.C.A.* § 371.]

As part of his plea agreement, Fanelli acknowledged that "[i]n conformity with the United States Attorney's Office for the Eastern District of Pennsylvania, the government will inform the appropriate professional licensing and disciplinary board in Pennsylvania and other jurisdictions of the disposition of the criminal charges filed against the defendant in this case." The United States Attorney's Office informed the Board that Fanelli's "case does not involve the care or treatment of patients nor does it involve any improprieties in billing practices. The charges do not relate to Dr. Fanelli's ability to care for his patients." Further, the plea did not guarantee the status of his professional license because that determination was solely within the discretion of the appropriate licensing authority, here the Board.

In October 2000, the Board issued a Provisional Order revoking Fanelli's license. The Order afforded Fanelli thirty business days to request a modification or dismissal of the Board's Findings of Fact and Conclusions of Law by (1) submitting a written request for modification or dismissal; (2) setting forth in writing any and all reasons why the findings should be modified or dismissed; and (3) submitting all documents or other written evidence supporting the request, as well as any other evidence Fanelli wished the Board to consider in mitigation of the penalty set forth in the Order. The Order further stated:

> Any submissions will be reviewed by the Board, and the Board will thereafter determine whether further proceedings are necessary. If no material discrepancies are raised through a supplemental submission ... or if the Board is not persuaded that submitted materials merit further consideration, a Final Order of Discipline will be entered.

Fanelli requested modification or dismissal of the Board's Findings of Fact contained in the Provisional Order and an evidentiary hearing permitting him to submit mitigating evidence on the issue whether his license should be revoked. Fanelli sought to introduce testimonial evidence from patients and medical colleagues supporting his high ethical and moral character. He also intended to explain that he had withdrawn his original guilty plea and entered a new plea whereby he agreed to plead guilty only to one

count of conspiracy to unlawfully abstract and convert funds of an employee benefit plan to his own use. Finally, he requested oral argument before the Board. Fanelli's requests to present testimony and oral argument were denied. However, he was allowed to submit forty-seven letters from family members, friends, physicians, other licensed professionals, employees, and patients attesting to his good character and medical competence.

In January 2000, the Board considered Fanelli's written submissions. The Board accepted his representation that he withdrew his original guilty plea and entered a subsequent plea, in which he pled guilty to only one count of conspiracy. Although Fanelli had attempted to shift blame from himself to his wife, the Board stated that as the co-administrator of his employees' pension fund he was responsible for its safekeeping. Further, the Board found that his plea of guilty to the conspiracy charge prevented him from arguing that he was not part of the conspiracy. Thus, the Board issued a Final Order of Discipline revoking Fanelli's license to practice medicine and surgery in the State of New Jersey, citing *N.J.S.A.* 45:1–21(e) and (f).

The statute relied on by the Board provides:

A board may refuse to admit a person to an examination or may refuse to issue or may suspend or revoke any certificate, registration or license issued by the board upon proof that the applicant or holder of such certificate, registration or license:

. . . .

e. Has engaged in professional or occupational misconduct as may be determined by the board;

f. Has been convicted of, or engaged in acts constituting, any crime or offense involving moral turpitude or relating adversely to the activity regulated by the board. For the purpose of this subsection a judgment of conviction or a plea of guilty, non vult, nolo contendere or any other such disposition of alleged criminal activity shall be deemed a conviction[.]

[*N.J.S.A.* 45:1–21(e) and (f).]

The Board reasoned that Fanelli's conviction on criminal charges that the Board found to involve moral turpitude and to relate adversely to the practice of medicine provided grounds for the revocation of his license.

After the Board issued its Final Order, the Pennsylvania State Board of Osteopathic Medicine filed disciplinary charges against Fanelli based on the action taken by the Board in this State. The record does not inform us of the results of those proceedings.

Fanelli appealed the Board's Order to the Appellate Division. He also petitioned the Board for a stay pending appeal. The Board, and later the Appellate Division, denied Fanelli's motion. We subsequently granted Fanelli's motion for a stay pending appeal.

The Appellate Division, in an unpublished *per curiam* opinion, affirmed the Board's Order. In its opinion, the court set forth the reasons why Fanelli had desired a hearing:

Because of this statutory provision, the doctor believes he was entitled to an evidentiary hearing, with an opportunity to cross-examine witnesses and present witnesses on his own behalf. The doctor wanted to present evidence in an evidentiary hearing to demonstrate that his unlawful actions were unrelated to the practice of medicine. He wanted also to testify regarding the circumstances leading to his guilty plea. According to the doctor, if given the chance, he would have shown that he, not the public, was the only victim of the wrongful acts of which the Board cites.

The court denied Fanelli a hearing and rejected his argument that *N.J.S.A.* 45:1–21(e) and (f) are inapplicable because his crime did not involve professional misconduct or moral turpitude. Fanelli had alleged that because his crime did not involve the treatment or care of patients, he could not be said to have committed professional misconduct. Rejecting that interpretation, the court observed that "[t]oday, the practice of medicine includes more than patient care, and the Board can rightfully be concerned with how doctors run their offices, keep their records, treat their employees[,] and deal with any funds generated through their medical practice." The court also dismissed Fanelli's argument that his actions were at best negligent and did not constitute professional misconduct or involve moral turpitude. The court concluded that the Board properly rejected Fanelli's arguments because his explanation of his guilty plea to conspiracy conflicted with his plea in federal court. In addition, it noted that although the Board allowed Fanelli to submit documentation to raise mate-

rial discrepancies, he failed to provide the transcript of his guilty plea proceeding. Thus, based on the record, Fanelli failed to raise any material discrepancies relating to his plea. In the absence of such documentation, the panel found that the Board acted appropriately based solely on the guilty plea. Accordingly, the court found that the Board's decision was not unconstitutional, arbitrary, or contrary to legislative policies.

We granted Fanelli's petition for certification. 171 *N.J.* 336, 793 *A.*2d 715 (2002).

## II

In 1969, the Legislature enacted the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to—15. Although the APA provides a road map for navigating administrative proceedings, it does not create a substantive right to an administrative hearing. *Valdes v. New Jersey State Bd. of Med. Examiners,* 205 *N.J.Super.* 398, 404, 501 *A.*2d 166 (App.Div.1985) (quoting *In re Application of Modern Indus. Waste Serv.,* 153 *N.J.Super.* 232, 237, 379 *A.*2d 476 (App.Div.1977)). "[T]he right to an administrative hearing generally must be found outside the APA in another statute or constitutional provision[.]" *Christ Hosp. v. Department of Health and Senior Servs.,* 330 *N.J.Super.* 55, 61, 748 *A.*2d 1156 (App.Div. 2000). There is one exception: "[T]the APA itself grants a right to a hearing when an agency revokes or refuses to renew a license." *Ibid.* According to *N.J.S.A.* 52:14B–11,

[no] agency shall revoke or refuse to renew any license unless it has *first* afforded the licensee an opportunity for a hearing in conformity with the provisions of *this act applicable to contested cases.*

[ (Emphasis added).]

A contested case is defined as

*[a] proceeding including any licensing proceeding,* in which the legal rights and duties, obligation, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by agency decisions ... addressed to them ... *after opportunity for an agency hearing* [.]

[*N.J.S.A.* 52:14B–2(b) (emphasis added).]

The statute thus reflects our State's long-standing commitment to procedural fairness in administrative proceedings. " 'The right to a hearing before a governmental agency, whose proposed action will affect the rights, duties, powers or privileges of, and is directed at, a specific person, has long been imbedded in our jurisprudence.'" *Limongelli v. New Jersey State Bd. of Dentistry*, 137 *N.J.* 317, 328, 645 *A.2d* 677 (1993) (determining that even if APA does not apply, fundamental fairness required Board to provide dentist adequate notice and opportunity to respond to charges before denying relicensure) (quoting *Cunningham v. New Jersey Dep't of Civil Serv.*, 69 *N.J.* 13, 19, 350 *A.2d* 58 (1975)). Similarly, in *In re Revocation of the License of Polk*, 90 *N.J.* 550, 579–80, 449 *A.2d* 7 (1982), we found that the Board could not summarily impose a revocation sanction without allowing the physician a hearing.

*N.J.S.A.* 52:14B–11 provides that in a license revocation matter the licensee has the right to a hearing and that the hearing must follow the procedures used in contested cases. The statute establishing procedures in contested cases states that "all parties shall be afforded an opportunity for [a] hearing after reasonable notice ... [and an] opportunity shall be afforded ... to respond, *appear and present evidence and argument on all issues involved.*" *N.J.S.A.* 52:14B–9 (emphasis added).

As noted, *N.J.S.A.* 52:14B–11 represents the "one instance" in which the APA itself provides parties the right to a hearing. See 37 *New Jersey Practice, Administrative Law and Practice*, § 4.6, at 183–84 (Lefelt, et al.) (2000). Once the right to a hearing is established, as it is in these circumstances, the issue becomes what type of hearing is required under the law.

### III

According to the plain language of *N.J.S.A.* 52:14B–11 and—9, a plenary hearing is required in the circumstances of this appeal. Because Fanelli's license is subject to revocation, *N.J.S.A.* 52:14B–11 states that he must be afforded the opportuni-

ty to have a hearing conducted pursuant to the procedures for contested cases. Thus, he may "respond, appear and present evidence and argument on all issues involved." *N.J.S.A.* 52:14B–9.

The Board contends, however, that Fanelli must demonstrate that in these circumstances adjudicative facts are contested before he can have an evidentiary hearing. There are contested adjudicative facts in this appeal.

The Board suggested at oral argument that the sentencing transcript will reveal that Fanelli was involved in the conspiracy and that he had actual knowledge of his wife's embezzlement. Yet, Fanelli maintains that he did not have actual knowledge. Because neither the Board nor this Court have had the benefit of the plea or sentencing transcripts, a determination of the extent of Fanelli's knowledge is critical. Moreover, even if Fanelli had actual knowledge the inquiry does not end there. An open question is whether Fanelli pled guilty to a conspiracy "to commit any offense against the United States" or "to defraud the United States." 18 *U.S.C.A.* § 371. That determination is relevant because the presence of fraud is a clearer indicator of moral turpitude than the more nebulous conspiracy to "commit any offense against the United States." *Infra* at 177, 803 *A.*2d at 1154. Thus, the Board should be informed of, and reconcile if necessary, the underlying facts that resulted in Fanelli's plea. Because there are facts in dispute in this matter, the right to present evidence includes, in these circumstances, the right to present testimony. Further, in light of the fact that a plenary hearing will be conducted in respect of those and related issues, Fanelli also should have the opportunity to dispute the findings concerning professional misconduct, and to argue that license revocation was not the proper sanction.

We therefore conclude that Fanelli is entitled to a plenary hearing pursuant to *N.J.S.A.* 52:14B–9 and—11.

### IV

In the Conclusions of Law section of its Final Order of Discipline, the Board stated that Fanelli's "conviction on criminal

charges involving moral turpitude and relating adversely to the practice of medicine provides grounds for the suspension or revocation of [Fanelli's] license to practice medicine in New Jersey pursuant to *N.J.S.A.* 45:1–21(e) and (f)." As noted, *N.J.S.A.* 45:1–21(e) and (f) state, in pertinent part:

A board may ... suspend or revoke any ... license issued by the board upon proof that the applicant or holder of such certificate, registration or license:

. . . .

e. Has engaged in professional or occupational misconduct as may be determined by the board;

f. Has been convicted of ... any crime or offense involving *moral turpitude or relating adversely to the activity regulated by the board* [.]

[ (Emphasis added.) ]

Fanelli maintains that the Board's revocation of his license was arbitrary and capricious because his guilty plea to conspiracy did not involve moral turpitude and did not relate adversely to the practice of medicine. Because this matter will be remanded to the Board, we provide the following guidance to the parties.

A

The legislative history of *N.J.S.A.* 45:1–21 does not define moral turpitude; courts and governmental agencies must look elsewhere for its definition. In *State Board of Medical Examiners v. Weiner*, a doctor challenged the State Board of Medical Examiners' temporary suspension of his license to practice medicine pending the outcome of a manslaughter indictment involving Weiner's treatment of patients. 68 *N.J.Super.* 468, 471, 172 *A.*2d 661 (App.Div.1961). The Appellate Division held that because the Board was without the statutory authority to suspend a medical license merely because of the pendency of a criminal indictment against a licensee, it was unnecessary to resolve the question whether manslaughter was a crime of moral turpitude. *Id.* at 482, 172 *A.*2d 661. Nevertheless, the court discussed the concept of moral turpitude. *Id.* at 482–485, 172 *A.*2d 661. In so doing, the court examined whether a manslaughter indictment, under any circumstances, could involve moral turpitude and, if so, whether

*N.J.S.A.* 45:9–16, which empowered the Board to revoke a license,[1] permitted it to determine what constituted moral turpitude. *Id.* at 483, 172 *A.*2d 661. The Appellate Division observed:

> What is 'moral turpitude?' It has been defined as an 'act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men, to society in general, contrary to the accepted and customary rule of right and duty between man an man,' ... and as, 'in its legal sense * * * everything done contrary to justice, honesty, modesty, or good morals.' The United States Supreme Court, in connection with alien deportation proceedings, has held that, in addition to 'crimes * * * of the gravest character,' any crime in which fraud is an ingredient involves moral turpitude. But the attempt to apply these definitions to specific criminal acts, especially in the context of license revocation proceedings, has demonstrated only the elasticity of the phrase and its necessarily adaptive character, reflective at all times of the common moral sense prevailing throughout the community.
>
> [ (Emphasis added) (citations omitted).]

The *Weiner* court cited several out-of-state cases that found certain offenses warranted suspension of a medical license. See *Du Vall v. Board of Med. Exam'rs of Arizona,* 49 *Ariz.* 329, 66 *P.*2d 1026 (Ariz.1937) (dispensing and prescribing narcotics for non-medical use); *Bancroft v. Board of Governors,* 202 *Okla.* 108, 210 *P.*2d 666 (Okla.1949) (issuing check with insufficient funds with intent to defraud); *State Med. Bd. v. Rodgers,* 190 *Ark.* 266, 79 *S.W.*2d 83 (Ark.1935); (possession of counterfeit money with intent to circulate); *State Bd. of Med. Exam'rs v. Harrison,* 92 Wash. 577, 159 *P.* 769 (Wash.1916) (sending notices and information advertising performance of criminal abortions); *Brun, supra,* 191 *A.* at 240 (repeated acts of indecent exposure); *Craft v. Balderston,* 58 *Idaho* 650, 78 *P.*2d 122 (Idaho 1938) (fraudulent claims of treatment of disabled veterans); *In re Kindschi,* 52 *Wash.*2d 8, 319 *P.*2d 824 (Wash.1958) (willful attempt to evade federal income taxes).

New Jersey courts also have held that certain crimes involve moral turpitude. *See, e.g., In re Schmidt and Sons,* 79 *N.J.* 344, 352, 399 *A.*2d 637 (1979) (crimes of fraud, dishonesty, and attempt-

---

[1] *N.J.S.A.* 45:9–16 was repealed in 2000. See L.1999, c. 403. Today, the Board's authority to revoke a license derives from *N.J.S.A.* 45:1–21.

ing to obstruct justice); *Berardi v. Rutter*, 23 *N.J.* 485, 485, 129 *A.*2d 705 (1957) (falsification of tax return); *DeMoura v. Newark*, 90 *N.J.Super.* 225, 229, 217 *A.*2d 19 (App.Div.1966) (filing false and fraudulent tax returns); *Fromm v. Bd. of Dirs. of Police and Firemen's Ret. Sys.*, 81 *N.J.Super.* 138, 144–45, 195 *A.*2d 32 (App.Div.1963) (fixing parking tickets); *Raphalides v. New Jersey Dep't Civil Serv.*, 80 *N.J.Super.* 407, 409, 194 *A.*2d 1 (App.Div. 1963), *certif. denied*, 41 *N.J.* 597, 198 *A.*2d 444 (1964) (larceny); *O'Halloran v. DeCarlo*, 156 *N.J.Super.* 249, 254, 383 *A.*2d 769 (Law Div.), *aff'd*, 162 *N.J.Super.* 174, 392 *A.*2d 615 (App.Div.), *certif. denied*, 79 *N.J.* 469, 401 *A.*2d 226 (1978), *cert. denied*, 442 *U.S.* 917, 99 *S.Ct.* 2837, 61 *L.Ed.*2d 284 (1979) (conspiring to prevent administration of state laws pertaining to public advertisement for bids and public bidding in public contracts).

However, in *Matter of Meisnere*, 471 *A.*2d 269, 270 (D.C.1984), the Court of Appeals for the District of Columbia considered whether an attorney's guilty plea pursuant to 18 *U.S.C.A.* § 371, the same crime at issue in this appeal, involved a crime of moral turpitude that would subject the attorney to disbarment pursuant to *D.C.Code* § 11–2503(a). There, the attorney pled guilty to conspiracy to defraud the Internal Revenue Service, contrary to 18 *U.S.C.A.* § 371, and perjury, contrary to 18 *U.S.C.A.* § 1623. *Id.* at 269–70. The District of Columbia Board on Professional Responsibility found that the attorney was convicted of crimes involving moral turpitude, and therefore was subject to discipline. *Id.* at 270. Although the appeals court affirmed the attorney's disbarment, it noted that

[a] violation of 18 *U.S.C.* [§ ] 371, the conspiracy statute[,] *does not necessarily constitute moral turpitude per se since the statute prohibits both conspiracy to commit an offense against the United States and conspiracy to defraud the United States.* In this case, however, the information to which Respondent pleaded guilty, *specifically* charged *conspiracy knowingly to defraud the United States* by obstructing the Treasury Department in its attempt to ascertain the assets of and the taxes due from one Leon Durwood Harvey. Thus[,] the information to which [Meisnere] pleaded guilty necessarily required proof of intent to defraud. *Intent to defraud inherently involves moral turpitude.*

[*Id.* at 270–71 (emphasis added).]

Whether the Board in this appeal acted arbitrarily and capriciously in finding that Fanelli's crime involved moral turpitude turns on a full *understanding* and *interpretation* of Fanelli's crime. The record reflects that Fanelli pled guilty to conspiracy to unlawfully abstract and convert funds of an employee benefit plan to his own use, in violation of 18 *U.S.C.A.* § 371. Although Fanelli pled guilty to 18 *U.S.C.A.* § 371, unlike the attorney in *Meisnere,* it is unclear whether he pled guilty to conspiracy to knowingly defraud the United States. Fanelli pled guilty to *"conspiracy to unlawfully* abstract and convert to his own use, funds of an employee benefit plan[.]" 18 *U.S.C.A.* § 371. As in *Meisnere,* we note the distinction in 18 *U.S.C.A.* § 371 between conspiracy to commit an offense against the United States and conspiracy to defraud the United States.

In the absence of plea and sentencing transcripts and other evidence, we cannot decide on this record whether Fanelli's crime involved moral turpitude. The introduction of relevant evidence at a hearing before the Board will permit the Board to make an informed decision. We expect that the parties will offer all available transcripts of his plea and sentencing hearings as well as any other relevant evidence on various issues, including whether he had actual or constructive knowledge of his wife's misappropriation. However, we emphasize that the Board has the burden of proving the elements of moral turpitude.

### B

We also must evaluate the Board's determination that Fanelli's "conviction on criminal charges ... relat[ed] adversely to the practice of medicine ... pursuant to *N.J.S.A.* 45:1–21(f)[.]"

Although there is no caselaw interpreting *N.J.S.A.* 45:1–21(e), decisions in other jurisdictions interpreting similar language in other statutes provide guidance. The Supreme Court of Washington in *Haley v. Medical Disciplinary Board,* addressed the relationship between the practice of medicine and allegedly unprofessional conduct. 117 *Wash.*2d 720, 818 *P.*2d 1062, 1068 (Wash.1991)

(en banc). The issue in that case was whether a doctor's sexual conduct with a patient under his care violated a Washington statute providing that "the commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's 'profession' constitutes unprofessional conduct." *Ibid.* (quoting *Wash. Rev.Code* § 18.130.108(1) (1990)). In finding that the doctor's actions did relate to the practice of medicine, the Court observed that "the conduct must indicate unfitness to bear the responsibilities of, and to enjoy the privileges of, the profession." *Ibid.* The court took a broad view in respect of what may be "related to" the practice of medicine:

The conduct need not have occurred during the actual exercise of professional or occupational skills, nor need the conduct raise general doubts about the individual's grasp of those skills. In the context of medical disciplinary proceedings, and in the light of the purposes of such proceedings, conduct may indicate unfitness to practice medicine if it raises reasonable concerns that the individual may abuse the status of being a physician in such a way as to harm members of the public, or if it lowers the standing of the medical profession in the public's eyes.

[*Haley, supra*, 818 *P*.2d at 1069.]

The *Haley* court relied on a prior Washington Supreme Court decision, *In re Revocation of License of Kindschi,* where the Board suspended a physician's license after he was convicted of tax fraud. 52 *Wash.*2d 8, 319 *P*.2d 824, 825 (Wash.1958). Although the tax fraud was not related to the physician's diagnosis, care, or treatment of a patient, the court upheld the Board's findings, determining that the physician's crime related to the practice of medicine. Specifically, the Court stated:

The daily practice of medicine concerns life and death consequences to members of the public. They have an understandable interest in the maintenance of sound standards of conduct by medical practitioners. The public has a right to expect the highest degree of trustworthiness of the members of the medical profession. We believe there is a rational connection between income tax fraud and one's fitness of character or trustworthiness to practice medicine, so that the legislature can properly make fraudulent conduct in such instances a ground for revoking or suspending the license of a doctor.

[*Id.* at 826.]

In so holding, the court noted that a medical disciplinary proceeding serves two purposes: (1) to protect the public; and (2) to

protect the standing of the medical profession in the eyes of the public. *Ibid.*

Here, the Appellate Division stated:

Today, the practice of medicine includes more than patient care, and the Board can rightly be concerned with how doctors run their officers, keep their records, treat their employees and deal with any funds generated through the medical practice.

The Appellate Division also noted that Fanelli "wanted to present evidence in an evidentiary hearing to demonstrate that his unlawful actions were unrelated to the practice of medicine." Fanelli should have that opportunity.

We emphasize that our remand on this issue is for the purpose of allowing Fanelli to prove his contention and is not to be construed as a conclusion on our part that the underlying offense does or does not relate adversely to the practice of medicine.

## V

In respect of the remand hearing, we offer the following guidance to all parties.

We accept Fanelli's representation that he is not repudiating his plea or requesting a full trial on the issue of his liability for conspiracy. Fanelli may not re-litigate his guilt or innocence in light of his guilty plea. However, he should be permitted to develop the core facts concerning the pension fund and his conduct, particularly in regard to his knowledge, whether actual or constructive. He also may be heard on the question of moral turpitude and the relationship between his crime and the activities regulated by the Board. Further, he may present evidence on mitigation and argue that a sanction less than a full revocation of his license is justified under the circumstances.

It is unclear whether character witnesses will be required at the hearing. If character is a contested issue in this matter, Fanelli will be entitled to offer witnesses. If character is not in issue but the fact-finder believes that a character witness could assist it on a particular issue, such as moral turpitude or mitigation, such testimony may be allowed in the sole discretion of the fact-finder.

Finally, the Board retains the discretion to determine, subject to appellate review, whether discipline should be imposed and, if so, the quantum of that discipline.

Reversed and remanded.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.