KUSKIN, J.T.C.
Plaintiff McKesson Water Products Company (“Water Products”) challenges an assessment of corporation business tax (“CBT”) in the sum of $807,092 imposed for the period April 1, 1999 through February 29, 2000 by defendant Director of the New Jersey Division of Taxation (“Director”) pursuant to the New Jersey Corporation Business Tax Act (“Act”), N.J.S.A. 54:10A-1 to -41. Water Products’ CBT return for the period showed a total tax liability of $244,990, an amount $1,820,110 less than the estimated taxes of $2,065,100 that Water Products previously had paid. The Director treated the return as, in effect, a refund claim. After determining that Water Products received gain allocable to New Jersey as a result of a deemed sale of assets pursuant to an election under Section 338(h)(10) of the Internal Revenue Code, the Director imposed CBT for the period in issue in the amount of $1,052,082 ($244,990 plus $807,092), and issued a refund of $1,013,018 ($2,065,100 minus $1,052,082). Water Products protested the Director’s determination, and, after failing to obtain the relief it sought through the administrative process, filed this appeal.
*451 Both Water Products and the Director have moved for summary judgment. For the reasons set forth below, I hold that Water Products is entitled to the additional refund it seeks. Consequently, I grant Water Products’ motion and deny the Director’s motion.
I. BACKGROUND
During the time period in issue, Water Products was a Delaware corporation with its commercial domicile and principal place of business in California. It was engaged in the business of the sale of bottled drinking water nationally, using both direct delivery and retail outlets. The corporation was a wholly-owned subsidiary of McKesson Corporation (“Parent”). Parent’s business was the sale of health-related, primarily pharmaceutical-type, products.
On January 10, 2000, Parent, as seller, entered into an agreement with Danone International Brands, Inc., and Groupe Danone, S.A. (together “Danone”), as buyers, under which Parent agreed to sell all of its stock of Water Products to Danone. The sale closed on February 29, 2000. In connection with this transaction, Parent and Danone made an election under Section 338(h)(10) of the Internal Revenue Code.
A Section 338(h)(10) election permits a sale of stock to be treated, for federal income tax purposes, as a sale of assets by the entity whose stock is being sold (the “target corporation”) to a hypothetical new corporation of the same name. The target corporation is deemed to have received a purchase price equal to the amount that was in fact paid by the purchaser to the parent corporation as consideration for the purchase of the target corporation’s stock. The target corporation is then deemed to have made a liquidating distribution to its shareholder(s). As a result of the deemed sale, the assets of the target corporation receive a stepped-up basis for purposes of depreciation under the Internal Revenue Code. See Treas. Reg. 1.838-l(a) and (d) (describing a deemed sale of assets transaction).
Pursuant to Section 338(h)(10), therefore, Parent’s sale of Water Products stock to Danone was treated as if Water Products had *452 sold its assets to a new company of the same name. The new company was deemed to have paid to Water Products, as the purchase price for the assets, an amount equal to the purchase price Danone paid Parent for Water Products’ stock. Water Products was then deemed to have liquidated and to have distributed to Parent the proceeds of the hypothetical sale of its assets.
By regulation, N.J.A.C. 18:7-5.8, the Director has recognized Section 338(h)(10) elections for purposes of the CBT. The regulation is entitled “Calculation of gain in certain instances” and provides as follows:
(a) A selling parent corporation in a Federal I.R.C. 338(h)(10) transaction does not recognize gain on the sale of target stock for New Jersey purposes for acquisition dates occurring on or after January 14,1992.
(b) Where a target corporation recognizes gain as the result of an I.R.C. 338(h)(10) election, the target reports and pays tax on such gain pursuant to N.J.AC. 18:7-5.1(a).
[N.J.A.C. 18:7-5.8.]
Water Products contends that the gain resulting from its deemed sale of assets under the Section 338(h)(10) election may not be allocated to New Jersey for CBT purposes because the gain constituted nonoperational income under N.J.S.A. 54:10A-6.1(a). This statute permits allocation to New Jersey of “operational” income but requires that “nonoperational” income be assigned to a corporation’s principal place of business. The statute provides as follows:
“Operational income” subject to allocation to New Jersey means income from tangible and intangible properly if the acquisition, management and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations and includes investment income serving an operational function. Income that a taxpayer demonstrates with clear and [cogent] convincing evidence is not operational income, is classified as nonoperational income, and the nonoperational income of taxpayers [other than those that have their principal place from which the trade, or business of the taxpayer is directed or managed in this State,] is not subject to allocation, but shall be specifically assigned; provided that 100% of the nonoperational income of a taxpayer that has its principal place from which the trade or business of the taxpayer is directed or managed in this State shall be specifically assigned to this State to the extent permitted under the Constitution and statutes of the United States.
[N.J.S.A. 54:10A-6.1(a).]
The bracketed language in the quotation was deleted by 2002 amendments, L. 2002, c. 40, § 9, and the underlined portion was *453 added by those amendments. The amendments were applicable to “taxable years beginning on and after January 1, 2002.” L. 2002, c. 40, § 33.
As in effect for the period April 1, 1999 to February 29, 2000, the statute required “clear and cogent” evidence that income was nonoperational. This phrase appears to have been derived from a decision by the United States Supreme Court in Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) where the Court stated: “As previously noted, the taxpayer always has the distinct burden of showing by clear and cogent evidence that the state tax results in extraterritorial values being taxed” (citations and internal quotations omitted). 463 U.S. at 175,103 S.Ct. at 2945, 77 L.Ed.2d at 559-60
N.J.S.A. 54:10A-6.1 was enacted in 1998, L. 1993, c. 173, § 5. The Assembly Appropriations Committee Statement to the legislation including this statute contained the following explanation of the statute:
[T]he United States Supreme Court recently determined in the Allied[-]Signal, Inc. case that a corporation may have certain types of corporate income that have no relationship with the corporation’s activities in a particular state and which therefore may not be included in the income that is subject to allocation and taxation by that state. This bill makes technical changes to the determination of the allocation of entire net income to make certain that the expenses of generating income that cannot be taxed by New Jersey are not deducted from the income that is taxable by New Jersey and to fairly allocate the income of a corporation that New Jersey may tax.
[Assembly Appropriation Committee Statement to Assembly, Nos. 273 and 1870.]
The Assembly Budget Committee Statement to the 2002 amendments explains the change in, and additions to, the statutory language relating to nonoperational income as follows:
The bill requires that 100 percent assignment of “nonoperational income” (income that is unrelated to the usual operations of the business, usually headquarters-managed investment income) be assigned to the headquarters state to the extent permitted under the Constitution and statutes of the United States. This income usually may only be taxed by the headquarters state, but current law treats it like income from operations and apportions it by formula, which allows a significant part of the nonoperational income of New Jersey headquartered companies to escape taxation.
[Assembly Budget Committee Statement to Assembly, No. 2501 at pp. 4-5 (June 27, 2002).]
*454 The decision to which the Assembly Appropriations Committee Statement refers is Allied-Signal, Inc. v. Director, Division of Taxation, 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992), a case emanating from New Jersey. There, as suggested by the Statement, the Supreme Court held that, in order for income of an entity to be allocated or apportioned to a state, the income must relate to the business operations of the entity that is sought to be taxed The court distinguished between investment income and operational income.
It does not follow, though, that apportionment of all income is permitted by the mere fact of corporate presence within the State____What is required ... is that the capital transaction serve an operational rather than an investment function.
[504 U.S. at 786-87,112 S.Ct. at 2268,119 L.Ed.2d at 551-52.]
The distinction between operational and nonoperational income contained in the 1993 version of N.J.S.A. 54:10A-6.1 was consistent with Allied-Signal at least with respect to corporations such as Water Products, having their principal place of business outside of New Jersey. The 2002 amendments clarified the legislative intent to conform New Jersey law to the mandates of Allied-Signal.
The definitions of operational and nonoperational income in N.J.S.A. 54:10A-6.1 appear to have been derived from the Uniform Division of Income for Tax Purposes Act, 7 U.L.A 331 (1985 & Supp.1997) (“UDITPA”), adopted (with occasional modifications) in many states, but not in New Jersey. See I Jerome Hellerstein & Walter Hellerstein, State Taxation § 9.01 (3rd 2000 & Supp. 2007) (cataloging the states that have adopted UDITPA). The relevant UDITPA provision, Section 1, uses the terminology “business” and “nonbusiness” income instead of “operational” and “nonoperational” income. See Id. at § 9.05 (discussing the UDIT-PA provisions relating to the distinction between “business” and “nonbusiness” income). The difference is only one of terminology and not of substance. UDITPA defined “business income” as follows:
[I]ncome arising from transactions and activity in the regular course of the taxpayer’s trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.
*455 [UDITPA § l(a).J
The statute defined “nonbusiness income” as “all income other than business income.” UDITPA § 1 (e).
Much of the litigation under UDITPA has concerned the issue of whether the definition of “business income” established one or two tests to identify that income. Some courts have held that the definition created a single test, a “transactional test,” of which income from tangible and intangible property is one aspect. Other courts have held that the definition established two tests, one, the “transactional test,” relating to the nature of the transaction which produced the income, that is, whether the income arose from “transactions and activity in the regular course of the taxpayer’s trade or business,” and a separate test, the “functional test,” relating to whether the income was produced by “tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations.” See I Hellerstein, State Taxation, supra, § 9.05[2] (containing a compilation of cases adopting the single test interpretation and those adopting the two test interpretation). In construing and applying the functional test under the UDITPA language, the courts generally have focused on the conjunctive “and” in holding that, for a sale of tangible or intangible property to produce business income, the “disposition” must be an “integral part[ ] of the taxpayer’s regular trade or business operations.” [2]
N.J.S.A. 54:10A-6.1 (a) contains only the second part of the UDITPA definition, that is, the functional test. Legislative history does not describe our statute as being based on the UDITPA language. However, the wording of the New Jersey definition of “operational income” is so similar to the UDITPA definition of “business income” that I have little doubt that the source of the *456 New Jersey provision is the second part of the UDITPA definition. Our statute is not identical to the UDITPA definitional language. Specifically, besides using the “operational income” terminology, our statute N.J.S.A. 54:10A-6.1(a) as in effect during the tax period in issue, April 1, 1999 to February 21, 2000: 1) included “investment income serving an operational function” as operational income, and 2) imposed an evidential standard by providing that “[i]ncome that a taxpayer demonstrates with clear and cogent evidence is not operational income is classified as nonoperational income.”[3]
No reported decision in New Jersey has addressed the issue of whether, under a Section 338(h)(10) election, “gain” resulting from the deemed sale of assets is operational or nonoperational income.[4] Indeed, counsel have not cited, nor has my research disclosed, any reported New Jersey case discussing whether the gain from an actual (as opposed to a hypothetical) sale of corporate assets produces operational or nonoperational income. The issue has been addressed, however, in a variety of foreign states, generally under the UDITPA language as enacted in those states. Because I regard the definitions of operational and nonoperational income in N.J.S.A. 54:10A-6.1(a) as having their origin in the UDITPA definitions of business and nonbusiness income, the foreign state decisions are helpful and instructive in interpreting the New Jersey statute. Many of those decisions relate to the transactional test, and, therefore, are not relevant to my analysis. I will consider, however, the cases which interpret state statutes as incorporating a functional test, and will refer specifically to the discussion by the courts of the meaning of that test in the context of a sale of assets.
*457 This out-of-state authority, of course, is not binding on me for purposes of interpreting N.J.S.A. 54:10A-6.1(a). However, our New Jersey courts often look to out-of-state decisions for purposes of interpreting statutory language when there is no precedent in New Jersey that is of assistance, particularly where the out-of-state cases deal with language that is similar to New Jersey’s statutory language. See, e.g., In re Fanelli, 174 N.J. 165, 178, 803 A.2d 1146 (2002) (deriving “guidance” as to the interpretation of a New Jersey statute from “decisions in other jurisdictions interpreting similar language in other statutes”); Cooperstein v. Division of Taxation, 13 N.J.Tax 68, 82-83 (1993), aff'd, 14 N.J.Tax 192 (App.Div.1994), certif. denied, 140 N.J. 329, 658 A.2d 728 (1995) (noting the “persuasive effect of well-reasoned sister state decisions interpreting identical or nearly identical statutory language”).
II. OUT OF STATE AUTHORITY — ASSET SALES
All of the following cases involve actual, not hypothetical, sales of corporate assets. Where the sales have constituted liquidations or partial liquidations of a business, and the sale proceeds have not been reinvested in the business, the courts (with the exception of the California courts, as discussed below) uniformly have held, under the UDITPA definitions of business and nonbusiness income or similar language, that the sale proceeds were nonbusiness income.
In McVean & Barlow, Inc. v. New Mexico Bureau of Revenue, 88 N.M. 521, 543 P.2d 489 (Ct.App.1975), the New Mexico Court of Appeals interpreted a statute that included both the transactional and functional tests from UDITPA, in the context of a liquidation of a portion of the plaintiffs business, its big inch pipeline. The court concluded that the income resulting from the sale of the pipeline was not business income under either test.
In the present case, taxpayer was not in the business of buying and selling' pipeline equipment and, in fact, the transaction in question was a partial liquidation of taxpayer’s business and a total liquidation of taxpayer’s big inch business. The sale of equipment did not constitute an integral part of the regular trade or *458 business operations of taxpayer. The sale contemplated a cessation of taxpayer’s big inch business.
[Id. at 492.]
Laurel Pipe Line Co. v. Commonwealth of Pennsylvania, 537 Pa. 205, 642 A.2d 472 (1994), also involved a liquidation of a portion of a corporation’s business. The Supreme Court of Pennsylvania explained that the plaintiff discontinued operation of one of its pipelines and realized a gain of almost $4 million from a sale of the pipeline. After the sale, the plaintiffs board of directors declared dividends equal to the entire after-tax net proceeds and distributed the proceeds to the corporation’s stockholders. None of the proceeds were used for asset acquisitions or for use in the plaintiff’s business operations. In holding that the gain was not business income, the court stated that, generally, income constitutes business income under the functional test “if the gain arises from the sale of an asset which produced business income while it was owned by the taxpayer,” Id. at 475, but that income from a partial liquidation should be treated as nonbusiness income.
[T]he pipeline was not disposed of as an integral part of Laurel’s regular trade or business. Rather, the effect of the sale was that the company liquidated a portion of Its assets. This is evidenced by the fact that the proceeds of the sale were not reinvested back into the operations of the business, but were distributed entirely to the stockholders of the corporation. Although Laurel continued to operate a second, independent pipeline, the sale of the Aliquippa Cleveland pipeline constituted a liquidation of a separate and distinct aspect of its business.
[Ibid. (footnote omitted).]
The Indiana Tax Court confronted the issue of whether corporate income was business or nonbusiness income in May Department Stores Co. v. Indiana Department of State Revenue, 749 N.E.2d 651 (Ind. Tax Ct.2001). In order to facilitate its acquisition by May Department Stores, Associated Department Stores sold the retail stores comprising its Horne division, and the real estate associated with those stores. The Tax Court concluded that the definitions of business and nonbusiness income in the Indiana statute, which were virtually identical to the UDITPA definitions, created two tests, and analyzed the tax question under both tests. With respect to the functional test, the court stated that the “extraordinary nature or infrequency of the sale is irrelevant,” id. at 660, and that, if the property sold had an *459 integral function in the taxpayer’s unitary business, income from the sale could be apportioned and taxed as business income, even though the sale transaction did not constitute part of the taxpayer’s normal trade or business. The court concluded, however, that income generated by a partial liquidation of corporate assets was nonbusiness income.
[T]he functional test dictates that acquisition, management, use or rental, and disposition of property must constitute integral parts of regular business operations.
[Ibid.]
[E]ven though Associated’s sale of Horne’s assets was an uncommon transaction in the course of its regular trade or business operations, the gains from that transaction could theoretically be classified as business income. However, it will only be viewed as business income if the acquisition, management and disposition of Horne’s assets can be considered necessary or essential to Associated’s regular trade or business operations.
It was not. Associated, through all of its divisions, including Horne, was engaged in the business of department store retailing. The disposition of Horne’s assets was neither a necessary nor an essential part of Associated’s department store retailing business operations.... [T|he divestiture of Horne’s assets was for the benefit of a competitor and not for the benefit of Associated. Under these circumstances, this divestiture (or disposition of assets) could not have constituted an integral part of Associated’s regular trade or business operations. Therefore, the gains from the sale of Horne’s assets did not qualify as business income under the functional test.
[Id. at 665 (citations omitted).]
The Supreme Court of Ohio expressed a similar view in Kemppel v. Zaino, 91 Ohio St.3d 420, 746 N.E.2d 1073 (2001). There the assets of Logan Machine Company were liquidated and the corporation dissolved. The proceeds from the sale of the assets were distributed to the shareholders. In describing the functional test, the court stated:
Under the functional test, the extraordinary nature or infrequency of the transaction is irrelevant. Nevertheless, some courts that have adopted the functional test have also recognized that the sale of assets as part of the total or partial liquidation of a business is different from the sale of assets by a continuing business. . [I]n Laurel Pipe Line Co., the Pennsylvania Supreme Court, while recognizing the functional test, held that the partial liquidation of a company’s business by the sale of a pipeline that, had been idle for over a year “was not disposed of as an integral part” of the company’s regular trade or business and, therefore, was not business income.
*460 [Id. at 1076 (citations omitted).]
The Ohio court concluded:
The income received by Logan was not business income under either the transactional test or the functional test. The income in question resulted from a liquidation of assets followed by a dissolution of the corporation; this was a one time event that terminated the business. This was no sale in the regular course of a trade or business. Therefore, the income from the gain on the sale of the intangible personal property was not “business income”....
[Id. at 1076-77.]
North Carolina is in accord with the foregoing interpretations of the UDITPA language and similar language. In Lenox, Inc. v. Tolson, 353 N.C. 659, 548 S.E.2d 513 (2001), Lenox sold all of the assets of its subsidiary and immediately transferred the proceeds of the liquidation to Lenox’s sole shareholder. The court concluded that “when an asset is sold pursuant to a complete or partial liquidation, the court must focus on more than the question of whether the asset was integral to the corporation’s business” (citing Laurel Pipe Line Co. v. Pennsylvania, supra, 537 Pa. 205, 642 A.2d 472. Id. at 517).
[T]he phrase regular trade or business operations refers to business operations done in a recurring manner or at fixed or uniform intervals. Partial or complete liquidations are extraordinary events and are not recurring transactions ....
Furthermore, this Court has specifically noted that liquidation cases are in a separate category because the transaction at issue is a means of ceasing business operations rather than in furtherance thereof....
Therefore, when the transaction involves a complete or partial liquidation and cessation of a company’s particular line of business, and the proceeds are distributed to shareholders rather than reinvested in the company, any gain or loss generated from that transaction is nonbusiness income under the functional test.
[Id. at 517-18 (citations and internal quotation marks omitted).]
In Illinois, the courts have addressed the business income, nonbusiness income dichotomy in a series of cases, starting with Texaco-Cities Service Pipeline Co. v. McGaw, 182 Ill.2d 262, 230 Ill.Dec. 991, 695 N.E.2d 481 (1998). There, Texaco-Cities sold major segments of its pipeline assets and associated real estate, including its entire pipeline assets in Illinois. In deciding that the income from the sale was business income, the court noted that a sale of property will constitute business income “if the property and sale are essential to the taxpayer’s business operations.” Id. *461 at 485. The court distinguished Laurel Pipe Line on the following basis.
The court in Laurel Pipe Line found that the sale was a liquidation of a “separate and distinct aspect” of Laurel’s business, namely, all of its pipeline operations in a specific geographical region. In reaching this conclusion, the court considered the “totality of the circumstances surrounding the sale”, including the fact that the sales proceeds were distributed to the shareholders rather than being used to acquire business assets or generate income for use in future business operations. In the case at bar, by contrast, it was undisputed that following the sale, Texaco-Cities remained primarily in the business of providing transportation by pipeline, and that the sales proceeds were invested right back into that business rather than being disseminated to its shareholders.
[Id. at 486-87 (citations omitted).]
Based on the disposition of the proceeds of the sale, the Illinois Supreme Court decided that the proceeds were business income.
The disposition of sale proceeds was determinative in Blessing/White, Inc. v. Illinois Department of Revenue, 329 Ill.App.3d 714, 263 Ill.Dec. 572, 768 N.E.2d 332 (2002), where the plaintiff sold substantially all of the assets used in its regular course of business to an unrelated third party and distributed the sale proceeds to its shareholders. The court interpreted Texaco-Cities as follows:
[T]he functional test assumes a different application in cases where the taxpayer’s disposition of assets amounts to a corporate liquidation in cessation of business.... Texaco-Cities, in our view, tacitly recognizes the distinctive nature of corporate liquidations resulting in a discontinuation of business activity and suggests that the functional test will be met in such cases only where the property and the liquidation of assets (i.e. disposition) are essential to the taxpayer’s regular trade or operations.
[Id. at 341-42.]
In Mead Corp. v. Department of Revenue, 371 Ill.App.3d 108, 308 Ill.Dec. 566, 861 N.E.2d 1131 (2007), the court held that the sale by Mead of the assets of its Lexis/Nexis division produced business income because the corporation retained the proceeds of the sales and used them in its operations. The court distinguished Blessing!White as follows:
There, the corporate taxpayer sold substantially all of its assets, ceased doing business in Illinois, and distributed the proceeds to its individual shareholders. The court held that the functional tost is satisfied in such cases only where the property and the liquidation of assets, i.e., the disposition, are essential to the taxpayer’s regular trade or operations. Further, the court found significant that the proceeds were “not used to support any ongoing business concerns but, instead, *462 dispersed in their entirety to the company shareholders.” Here, in contrast, there was no such disbursement to shareholders. Rather, Mead remained in business and reinvested the gain in its ongoing business.
[Id. at 1142 (citations omitted).]
See also, National Holdings, Inc. v. Zehnder, 369 Ill.App.3d 977, 314 Ill.Dec. 181, 874 N.E.2d 91, 2007 WL 209984 (2007) (noting that “[f]ollowing the decisions in Texaco-Cities and Laurel Pipe Line, courts have recognized a business-liquidation exception to the functional test.” Id. at 984.)
The only divergence from the approach reflected in the foregoing decisions appears in decisions from the State of California, including Jim Beam Brands Co. v. Franchise Tax Board, 133 Cal.App.4th. 514, 34 Cal.Rptr.3d 874 (2005), which relies on Hoechst Celanese Corp. v. Franchise Tax Board, 25 Cal.4th 508, 106 Cal.Rptr.2d 548, 22 P.3d 324 (2001) as the primary basis for its interpretation of the relevant California statutory provisions. Hoechst Celanese did not involve income derived from a disposition or liquidation of assets, but rather the transfer of excess funds from a pension trust back to the corporation. The court held that, under the UDITPA definitions of business and nonbusiness income, the excess proceeds constituted business income. Jim Beam Brands involved a liquidation. Consequently, its reliance on Hoechst Celanese was misplaced.
In any event, California appears to be alone in treating gain from a liquidation as business income. As set forth above, other jurisdictions consistently have held that, in the case of a corporate liquidation where the proceeds are distributed to shareholders, the income does not constitute business income under the functional test of UDITPA. The California decisions do not demonstrate any errors in the analyses by the courts in New Mexico, Pennsylvania, Indiana, Ohio, North Carolina, and Illinois.
III. OUT OF STATE AUTHORITY — SECTION 338(h)(10)
The issue of whether income from the salé of assets is business or nonbusiness income also has arisen in the context of Section 338(h)(10) elections. There, too, the courts have been consistent in their holdings, as reflected in the following five decisions. The decisions are significant not only for their conclusions as to the nonbusiness nature of the income from a liquidating sale of assets, *463 but also for the manner in which they reach those conclusions, that is, by giving full credence to the Section 338(h)(10) election and the transactions that are deemed to have occurred as a result of the election.
In Canteen Corp. v. Commonwealth of Pennsylvania, 818 A.2d 594 (Pa.Commw.Ct.2003), aff'd, 578 Pa. 504, 854 A.2d 440 (2004), Canteen’s parent corporation made a Section 338(h)(10) election in connection with the sale of Canteen’s stock. The court viewed the transaction as if Canteen actually had sold all of its assets in liquidation and immediately distributed the proceeds to its parent. The court relied heavily on Laurel Pipe Line, supra, 537 Pa. 205, 642 A.2d 472, in concluding that, as a result of the election, “Canteen is deemed to have sold all of its assets in a complete liquidation, which results in nonbusiness income.” Canteen Corp., supra, 818 A.2d at 599.
In American States Insurance Co. v. Hamer, 352 Ill.App.3d 521, 287 Ill.Dec. 692, 816 N.E.2d 659 (2004), the plaintiffs parent made a Section 838(h)(10) election in connection with a sale that included the plaintiffs stock. The court discussed and rejected the California analysis of income arising in the context of Section 338(h)(10) elections, noting that an article cited by the Department of Revenue described a “growing consensus among state courts” that income from the sale of assets in connection with a complete liquidation constituted nonbusiness income. Id. at 666. The court concluded:
As the, Department [of Revenue] treats American States under Section 338(h)(10) of the Internal Revenue Code as two corporations — the “old,” liquidating American States and the “new” American States, (which is deemed an unrelated entity .. .) — [the Department] cannot claim that American States continued its business. Rather, it must treat the transaction as a liquidation of the “old” American States, which is the entity the Department seeks to tax.
The transaction at issue must be treated legally as a complete liquidation and cessation of business by the “old” American States. Indeed, even as a purely factual matter, the transaction involved the cessation of a separate and distinct portion of the business of the former shareholders of American States. Accordingly, the. trial court properly ruled the gain at issue was nonbusiness income.
[Id. at 667-68.]
*464 Utah has addressed the issue in an unreported decision, Chambers v. Utah State Tax Commission, (Utah D.Ct.2007), submitted by plaintiff, with a copy to the Director, see R. 1:36-3 (permitting citation of unreported decisions under certain circumstances). This case involved a sale of stock to Konica Phillips Company in connection with which the parties made a Section 338(h)(10) election. In discussing the functional test of the UDITPA definition of business income as enacted in Utah, the court found that the deemed sale of assets “did not benefit the company’s regular trade or business in any way. To the contrary, this disposition benefited only the shareholders of the company while resulting in the complete cessation of [the company] as operated by these shareholders.” [Id. Slip op. p. 10.] The Utah court concluded that the gain resulting from the deemed disposition of assets under the Section 338(h)(10) election was nonbusiness income.
The Supreme Court of Missouri recently addressed this issue in ABB C-E Nuclear Power Inc. v. Director of Revenue, 215 S.W.3d 85 (Mo.2007). In connection with the sale of the stock of ABB C-E Nuclear Power, its parent and the purchaser made a Section 338(h)(10) election. The court held that the gain on the deemed sale of assets was not taxable as business income under the UDITPA functional test.
The sale of ABB’s assets in a complete liquidation is not a type of business transaction in which ABB regularly engaged, nor was it a disposition of the sort that constituted an integral part of ABB’s ordinary business. Rather, the sale and liquidation of ABB was a one-time, extraordinary event.
[Id. at 87 (footnotes omitted).]
IV. CONCLUSION
I find the interpretations by the courts of our sister states of the UDITPA definitions of business and nonbusiness income, particularly in the context of Section 338(h)(10) elections, to be persuasive as to the proper interpretation of the terms “operational income” and “nonoperational” income as used in N.J.S.A. 54:10A-6.1(a). I also conclude that, having explicitly recognized, in N.J.A.C. 18:7-5.8, a Section 338(h)(10) election for purposes of CBT taxation, the Director is bound to accept all of the consequences of the election, that is, a deemed sale of assets by the target corporation followed *465 by its liquidation with the distribution to the parent corporation of the proceeds of the deemed sale.
Under N.J.S.A. 54:10A-6.1(a), operational income results “if the acquisition, management and disposition of the property constitute integral parts of the taxpayer’s regular trade or business operations and includes investment income serving an operational function.” (Emphasis supplied.) Under the judicial interpretations discussed above, the deemed sale of assets by, and liquidation of, Water Products did not constitute the acquisition, management and disposition of property as an integral part of the taxpayer’s regular trade or business operations. The result of the transaction, under the Section 338(h)(10) election made by Parent, as seller, and Danone, as buyer, was a cessation of Water Products’ business with a complete liquidation and distribution to Parent of the proceeds of the sale of Water Products’ assets. This was an extraordinary event in the company’s history, resulting in the deemed termination of its operations and existence. The gain resulting from the sale was neither operational income nor investment income serving an operational function because no operational function of Water Products continued after the deemed sale of assets and liquidation, and Parent did not invest the proceeds of the sale in a business similar to that conducted by Water Products.
I conclude, therefore, that Water Products has presented clear and cogent (and clear and convincing) evidence that the income resulting from its deemed sale of assets was nonoperational income under N.J.S.A. 54:10A-6.1(a). As a result, the income is not allocable to New Jersey and must be assigned to California, the location of Water Products’ principal place of business.
Because, no genuine issue as to any material fact exists and Water Products is entitled to a judgment in its favor as a matter of law, R. 4:46-2(c), I grant Water Products motion for summary judgment and deny the Director’s motion.[5]

 In reaction to those interpretations, some states, namely, Illinois, New Mexico, North Carolina, Pennsylvania, and Ohio, amended their respective statutes to include, as business income, proceeds from the sales of assets whether or not in the regular course of the taxpayer's business. See Jim Beam Brands Co. v. Franchise Tax Board, 133 Cal.App.4th 514, 34 Cal.Rptr.3d 874, 884 n. 7 (2005).

 As discussed above, "dear and cogent" was changed to "clear and convincing" by the 2002 amendments to N.J.S.A. 54:10A-6.1.

 Two reported New Jersey decisions have dealt with Section 338(h)(10) elections. General Building Products Corp. v. Director, Div. of Taxation, 14 N.J.Tax 232 (1994), aff'd, 15 N.J.Tax 213 (App.Div.1995); Mandelbaum v. Director, Div. of Taxation, 20 N.J.Tax 141 (2002). Neither involved the issue of operational versus nonoperational income.

 Omitted from this opinion is the discussion included in my bench opinion relating to the issue of whether Water Products and Parent conducted a unitary *466 business. In my bench opinion, I stated that, if I had been required to address the unitary business issue, I would have denied both parties' summary judgment motions because genuine issues as to material facts existed with respect to the issue.