**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4639-17T2

ANA AROCHO, NORMAN
HARRIS, NANCY LOPEZ, and
JESSICA ROMERO,

      Petitioners-Appellants,

v.

NEW JERSEY DEPARTMENT
OF COMMUNITY AFFAIRS,

      Respondent-Respondent.

Argued October 30, 2019 – Decided January 9, 2020

Before Judges Koblitz, Whipple and Mawla.

On appeal from the New Jersey Department of Community Affairs.

Olga D. Pomar argued the cause for appellants (South Jersey Legal Services, Inc., attorneys; Olga D. Pomar, on the briefs).

Dominic Larue Giova, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Donna Arons, Assistant

Attorney General, of counsel; Dominic Larue Giova, on the brief).

PER CURIAM

Petitioners Ana Arocho, Norman Harris, Nancy Lopez and Jessica Romero (the residents) are low-income homeowners who agreed to receive replacement homes in exchange for the houses they owned in the Mount Holly Township Gardens neighborhood. The replacement homes are funded by the federal Home Investment Partnerships Act (HOME), 42 U.S.C. §§ 12721 to -12756, and the funds are administered to the township by the New Jersey Department of Community Affairs (DCA).

In 2013, the residents and township entered into a settlement agreement as a result of a previous civil action.[1] The DCA and the developer of the replacement homes, TRFDP Mount Holly Urban Renewal, LLC, are not parties to this agreement. The DCA later entered into a "Grant/Loan Agreement" (grant agreement) with the developer. The residents and township are not parties to the grant agreement, which includes different deed restrictions than the

---

[1] Mt. Holly Citizens in Action, Inc., et al. v. Township of Mt. Holly, et al., Civil Action No. 1:08-cv-02584-NH-JS. The matter is discussed in Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly, 658 F.3d 375 (3d Cir. 2011).

settlement agreement. When the residents learned of the grant agreement terms, they sought to modify them. After the DCA agreed to reduce the affordability period from thirty to fifteen years, the residents signed the deeds for their homes, but reserved their right to seek relief to resolve the remaining deed restriction issues.

The residents appeal the May 4, 2018 decision of the DCA granting their request to reduce the restriction period but denying further requests to alter the grant agreement. The residents ask this court to order the DCA to modify the deed restrictions according to their requests, or alternatively to remand the matter to the Office of Administrative Law (OAL) for a hearing as a contested case. We remand to the OAL to develop a factual background and make a considered decision in light of pertinent regulations.

In November 2013, the residents entered into a settlement agreement with the township as a result of a previous civil action. The settlement agreement allowed any homeowner in the Gardens who wanted to remain in the community after it was redeveloped to turn over their current home to the township and receive an affordable replacement home. Under the settlement agreement, residents seeking a replacement home agreed to resale restrictions for a period

3

of fifteen years, limiting resale to households earning less than eighty percent of the area median income (AMI).

Also during that time, the developer contracted with the township to develop forty-four new homes (redevelopment agreement). The redevelopment agreement required the developer to "secure all subsidy and debt financing" such as "HOME and CHOICE [2] or any other public or private subsidy funds."

In 2015, the DCA and the developer entered into the grant agreement, awarding over $1.3 million dollars to the developer for the construction of six replacement homes in the Gardens. The grant agreement provides that the units "shall remain affordable, in accordance with HOME requirements, for a period of no less than" thirty years and "be reserved for households with a gross household income . . . that does not exceed [fifty] percent" of the AMI. The grant agreement listed the sales price of each unit as $52,500.

The grant agreement's section entitled "HOME PROGRAM PROVISIONS" sets forth the HOME program requirements the grantee is bound by in addition to the federal affordability requirements under the United States

---

[2] CHOICE refers to the New Jersey Housing and Mortgage Finance Agency's (HMFA) Choices in Home Ownership Incentives Created for Everyone (CHOICE) program. Press Release, N.J. Hous. and Mortg. Fin. Agency, HMFA Prioritized New Hous., Neighborhood Stabilization and Mixed-Use Dev. (July 13, 2017).

Department of Housing and Urban Development (HUD) regulations, Home Investment Partnerships Program, 24 C.F.R. Part 92 (2019). Furthermore, the grant agreement states that "[t]he New Jersey Housing and Mortgage Finance Agency (NJHMFA) through its unit the Housing Affordability Service (HAS) will monitor affordability controls . . . . [A]s required by the HOME program." The grant agreement requires the developer to ensure that appropriate mortgage and deed restrictions, consistent with Uniform Housing Affordability Controls (UHAC), N.J.A.C. 5:80-26.1 to -26.26, are duly recorded. In August 2016, the grant agreement was amended to reflect additionally obtained funding.

In December 2016, the developer executed a deed of easement with restrictive covenants. The deed states that the developer received HOME funding awarded by the DCA pursuant to the HOME statute and 24 C.F.R. Part 92. The developer also executed a mortgage note, promising to pay the DCA for the total amount of funding awarded to them. In May 2017, the developer entered into an agreement with NJHMFA, making HAS the administrative agent for the project (administrative agent agreement). Under the administrative agent agreement, the developer agreed it would comply with the HOME statute and the Fair Housing Act, N.J.S.A. 52:27D-301 to -329.9.

A-4639-17T2

In June 2017, the residents, the developer, and the DCA began communications regarding the restrictions provided in the grant agreement. Residents' counsel wrote to the developer, objecting to the restrictions limiting resale to homes earning fifty percent below the AMI for a thirty-year term as contrary to the terms of the settlement agreement. The residents explained that these terms created a disparity between the Gardens homeowners assigned to HOME units and other Gardens residents whose replacement homes were funded through other subsidy programs subject to less onerous restrictions. The residents asked the developer to seek a modification of the deed restrictions from the DCA, requesting the same terms as in the settlement agreement: "[fifteen] year restrictions with resale at [eighty percent] AMI."

In March 2018, residents' counsel wrote to the DCA objecting to the $52,500 initial purchase price upon which the resale price would be based, noting the price "is inconsistent with HOME requirements and would deprive the homeowners of a fair return on their investments." The following month, the DCA verbally informed counsel it would shorten the term of the deed restrictions from thirty years to fifteen years, but denied further modifications. Later that month, the residents requested an expedited hearing in the OAL as a contested case in accordance with N.J.S.A. 52:14B-2.

A-4639-17T2

On May 1, 2018, HUD issued a letter stating it had received the residents' complaint and forwarded it to the State of New Jersey for a response. Three days later, the DCA issued a final determination denying the residents' requests to modify the restrictions beyond its previous reduction of the affordability period:

> The length of the restriction will now, as you know, be [fifteen] years, during which time period the unit(s) can only be subsequently priced and resold to a household that is income eligible at less than [fifty percent] AMI. In addition, there will be a recapture at the first non-exempt sale of the property.

The DCA stated that these terms were in compliance with the terms of the grant agreement between the DCA and developer, as well as with UHAC. The DCA denied the request to deem the case "contested" and refer it to the OAL for a hearing. Upon a follow-up inquiry made on May 8, 2018, HUD stated that only the grantee, here the State, could request a waiver of any HOME program requirements.[3]

---

[3] Counsel for the DCA notified us for the first time at oral argument on October 30, 2019, that his client sent a letter twenty days earlier requesting that HUD approve the modifications requested by plaintiffs. We asked for and received a copy of that letter. If HUD grants the request, and the DCA follows through with its requested modifications, this litigation would be resolved.

In August 2018, the residents took title and possession of their HOME units. The deed provides that the sale and use of the property is governed by UHAC, there is a "Control Period" of fifteen years, and during that period the property can be conveyed only to an eligible household at a "Maximum Resale Price" approved by NJHMFA. The "Buyer Statement" provides that the units are categorized as fifty percent AMI units. The residents executed a recapture mortgage note requiring them to pay $177,500 to the DCA:

> Upon the first non-exempt sale of the [p]roperty after the date of this [n]ote, the [o]wner, or the heir, successor or assignee of the [o]wner then selling the [p]roperty, shall pay the sum of $177,500.00 amount determined pursuant to N.J.A.C. 5:80-26.5(c)[] to the State of New Jersey, acting by and through its Housing and Mortgage Finance Agency.

The buyer statement notes the grantee did not waive the right to appeal or otherwise challenge the validity of the deed restrictions.

## I. Standard of Review.

"Although not bound by an agency's determination on a question of law, our courts give 'great deference' to an agency's 'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible." In re N.J.A.C. 7:1B-1.1, 431 N.J. Super. 100, 114-15 (App. Div. 2013) (citation omitted) (quoting N.J. Ass'n of Sch. Adm'rs v. Schundler,

A-4639-17T2

211 N.J. 535, 549 (2012)). "This deference comes from the understanding that a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Id. at 115 (quoting In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Com'n, 234 N.J. 150, 157 (2018) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). Whether the DCA properly applied agency regulations will be reviewed under this deferential standard.

Whether the DCA violated the Administrative Procedures Act (APA), N.J.S.A. 52:14B-1 to -31, is not entitled to the same deference because it is a legal question that this court reviews de novo. See L.A. v. Bd. of Educ. of Trenton, 221 N.J. 192, 204 (2015).

## II. The DCA Complied With UHAC.

Federal regulations provide that an entity receiving HOME program funds must ensure that in the event of resale during the period of affordability, the home must be made available to "a buyer whose family qualifies as a low-

income family and will use the property as the family's principal residence." 24 C.F.R. § 92.254(a)(5)(i). The resale provision must ensure the price at resale "provides the original HOME-assisted owner a fair return on investment . . . and ensure that the housing will remain affordable to a reasonable range of low-income homebuyers." Ibid. The term "low-income families" is defined as "families whose incomes do not exceed [eighty] percent of the [AMI]." 42 U.S.C. § 12704(10).

In its grant agreement with the developer, the DCA limits resale to buyers from "households with a gross household income . . . that does not exceed [fifty] percent of the [AMI]." See N.J.A.C. 5:80-26.7(a). This resale provision is more restrictive than required, but complies with the federal regulation in that it does not exceed the ceiling of eighty percent AMI. See 42 U.S.C. § 12704(10).

The maximum resale price for a restricted ownership unit is either the initial purchase price, if resale occurs prior to the one-year anniversary of the date title was transferred, or, if on or after the one-year anniversary, then consistent with the "regional income limits most recently published by COAH[4] and calculated pursuant to N.J.A.C. 5:94-7.2(b)." N.J.A.C. 5:80-26.6(d). The federal regulations similarly require "a fair return on investment" for the

---

[4] Counsel on Affordable Housing. N.J.S.A. 5:80-26.2.

homebuyer. 24 C.F.R. § 92.254(a)(5)(i). In accordance with both regulations, the DCA's resale provisions provide residents the ability to resell their homes within one year of transfer for $52,500, the initial purchase price of the home listed in the grant agreement. Subsequently, the "maximum resale price shall be consistent with the regional income limits most recently published by COAH and calculated pursuant to N.J.A.C. 5:94-7.2(b)." See N.J.A.C. 5:80-26.6(d).

The DCA's recapture provisions are also in line with the minimum federal requirements, which require recapture provisions to ensure "that the participating jurisdiction recoups all or a portion of the HOME assistance to the homebuyers" if sold within the affordability period. 24 C.F.R. § 92.254(a)(5)(ii). The federal regulations provide a minimum period of affordability according to the initial purchase price of the unit. 24 C.F.R. § 92.254(a)(4). A unit valued at over $40,000 requires a minimum affordability period of fifteen years. Ibid.

Furthermore, the federal regulations provide that the recapture amount "cannot exceed the net proceeds" of the unit, which is calculated as "sales price minus superior loan repayment . . . and any closing costs." 24 C.F.R. § 92.254(a)(5)(ii)(A). A proper recapture provision allows recapture of "an amount equal to the difference between the unit's non-restricted fair market

11

value and its restricted price." N.J.A.C. 5:80-26.5(c). The grant agreement provides the DCA discretion to "reallocate HOME funds to other cost categories and/or recapture such funds should there be cost savings and/or a funding surplus." Therefore, the DCA's recapture provision, by which each resident executed a recapture note on their property for $177,500, may be consistent with HUD's guidance on proper recapture terms, although, given that the property was purchased by way of a home trade, its purchase price is open to dispute. See 24 C.F.R. § 92.254(a)(5)(ii)(A).

The residents argue the replacement units are expressly exempt from the language of UHAC. In response, the DCA argues it did not apply UHAC regulations to the HOME funded units, but instead "incorporated certain resale and recapture formulas by reference into its [c]onsolidated [p]lan[5] with HUD," which is "consistent with both the federal regulations governing the HOME [p]rogram and the underlying purpose of that program." It is the DCA's position

---

[5] To receive federally funded housing assistance grants, recipients, including the DCA, must develop and submit a "comprehensive affordability strategy," or a "consolidated plan incorporating such strategy." 42 U.S.C. § 12705(a), (g)(1). In 2015, the DCA developed its consolidated plan, describing its intended use of HUD funded grants, including the HOME Program grant. State of New Jersey Department of Community Affairs, 2015-2019 Consolidated Plan 7 (2015), https://www.nj.gov/dca/divisions/dhcr/announcements/pdf/2015%20Con%20Plan%20-%20FINAL.pdf.

that it "merely incorporated the resale and recapture language from UHAC as a term and condition that will be imposed in the [DCA]'s administration of federal funds" and the DCA "need not engage in rulemaking to enter into this agreement with HUD." The DCA argues the residents' argument fails because it is not applying UHAC rules to govern the HOME program as "state regulations cannot trump federal regulations." See Feldman v. Lederle Lab, 125 N.J. 117, 133 (1991).

Pursuant to UHAC:

> This subchapter provides rules for the establishment and administration of affordability controls on restricted units that receive COAH credit under the Fair Housing Act . . . . [H]owever, . . . the rules do not apply to units . . . receiving assistance under the Federal HOME Investment Partnerships program, 24 [C.F.R.] Part 92.
>
> [N.J.A.C. 5:80-26.1 (emphasis added).]

See also 49 N.J.R. 3423(c) (Oct. 16, 2017) (setting forth the exemption for units receiving federal HOME funding under 24 C.F.R. Part 92 from UHAC).

An entity receiving HOME funds "must establish the resale or recapture requirements that comply with the standards of this section and set forth the requirements in its consolidated plan. HUD must determine that they are appropriate." 24 C.F.R. § 92.254(a)(5). The DCA must adhere to HUD

regulations to receive federal funding under the HOME program to provide low-income homes to New Jersey residents. 24 C.F.R. § 92.107. Although UHAC exempts HOME-funded projects from its terms, the grant agreement between DCA and the developer set resale and recapture provisions. The DCA was acting within its authority and complying with federal regulations by establishing resale and recapture provisions in the implementation of a federal program. See 24 C.F.R. § 92.254(a)(5). Moreover, contrary to the residents' argument, the use of language in UHAC does not render the affordability controls improper. See ibid.; N.J.A.C. 5:80-26.1.

The DCA was in fact required to "establish the resale or recapture requirements that comply with the standards of this section and set forth the requirements in its consolidated plan" in order to receive HOME funds. See 24 C.F.R. § 92.254(a)(5). The residents' argument that the DCA acted arbitrarily in establishing resale and recapture provisions, notwithstanding that UHAC does not apply to HOME funded projects, is not persuasive.

III. The DCA Did Not Violate the APA by Adopting Its Policy of Applying the UHAC Regulations to Federal HOME-Funded Units Without Engaging in a Formal Rule-Making Process.

Contrary to the residents' argument, the DCA maintains it is "merely incorporat[ing] the resale and recapture language from UHAC as a term and

condition that will be imposed in [its] administration of federal funds."  "[I]f an agency's action constitutes a rule, it must comply with the APA requirements of notice and opportunity for comment."  Coal. for Quality Health Care v. N.J. Dept. of Banking and Ins., 348 N.J. Super. 272, 295 (App. Div. 2002). "Distinguished from rule-making is informal agency action, defined as 'any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry.'"  Ibid. (quoting Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 136-37 (2001)).

Six factors are used to determine whether agency action constitutes rule-making:

> [T]he agency [action] . . . (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on

15

administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 331-32 (1984).]

In its final decision, the DCA noted that "the specific requirements imposed here are within the allowable parameters set by HUD; in compliance with those parameters the [DCA] determined to utilize the UHAC regulations, which use has been approved by HUD and is the [DCA]'s normal procedure."

The DCA did not "effect[] a material change in existing law" by adopting UHAC language in the terms set forth for the replacement homes. In re Hearn, 417 N.J. Super. 289, 307 (App. Div. 2010) (quoting Metromedia, 97 N.J. at 330); see also Grimes v. N.J. Dep't of Corr., 452 N.J. Super. 396, 405-06 (App. Div. 2017). It did not engage in rulemaking.

### IV. The DCA'S Deed Restrictions Are Not Facially Inconsistent With the HOME Requirements.

The residents argue the DCA's deed restrictions violate federal law by depriving the residents of a "fair return on investment" pursuant to HOME. See 42 U.S.C. § 12745(b)(3)(A)(i). The residents rely on the rule of preemption by which federal law invalidates conflicting state law, citing Farina v. Nokia, Inc., 625 F.3d 97, 115 (3d Cir. 2010).

Under the HOME statute:

Housing that is for homeownership shall qualify as affordable housing under this subchapter only if the housing—

(1) has an initial purchase price that does not exceed [ninety-five] percent of the median purchase price for the area . . .

(2) is the principal residence of an owner whose family qualifies as a low-income family . . . [and]

(3) is subject to resale restrictions that are established by the participating jurisdiction and determined by the Secretary to be appropriate to—

(A) allow for subsequent purchase of the property only by persons who meet the qualifications specified under paragraph (2), at a price which will—

(i) provide the owner with a fair return on investment, including any improvements, and

(ii) ensure that the housing will remain affordable to a reasonable range of low-income homebuyers; or

(B) recapture the investment provided under this subchapter in order to assist other persons in accordance with the requirements of this subchapter, except where there are no net proceeds or where the net proceeds are insufficient to repay the full amount of the assistance . . . .

[42 U.S.C. § 12745(b)(1) to (3) (emphasis added).]

The residents argue the federal requirement that resale restrictions provide a fair return on investment "would be satisfied if DCA required a resale price

that would be affordable to households at [seventy percent] AMI, i.e. somewhere in the range of $152,000." They argue that UHAC is contrary to the federal statute because it uses the initial purchase price to determine the resale price if resale occurs within one year from the date title was first transferred. See N.J.A.C. 5:80-26.6(d). Subsequent to the one year period, resale price "shall be consistent with the regional income limits most recently published by COAH and calculated pursuant to N.J.A.C. 5:94-7.2(b).[6]" Ibid. It is the residents' position that the DCA violated the federal requirements by basing its deed restriction on "an arbitrary initial purchase price provided by the [d]eveloper." The residents proposed alternative methods for calculating initial purchase price, such as suggesting that the township pay residents who agree to sell their homes $150,000, the "agreed-upon estimate of the value of the residents' homes," in the settlement agreement.

"The maximum resale price for a restricted ownership unit" is either the initial purchase price, "if the resale occurs prior to the one-year anniversary of the date . . . title . . . was first transferred," or, if on or after the one-year

---

[6] N.J.A.C. 5:94-7.2 states that it expired on September 11, 2016, pursuant to the expiration statute for administrative procedure, N.J.S.A. 52:14B-5.1(b). See 43 N.J.R. 1203(a) (May 2, 2011) (providing a two-year extension of administrative code expiration dates).

anniversary, then consistent with the "regional income limits most recently published by COAH and calculated pursuant to N.J.A.C. 5:94-7.2(b)." N.J.A.C. 5:80-26.6(d) (emphasis added). The DCA's resale provisions provide the residents with the ability to resell each unit at $52,500, the initial purchase price of the home listed in the grant agreement, within the first year of title transfer. Subsequently, the "maximum resale price shall be consistent with the regional income limits most recently published by COAH and calculated pursuant to N.J.A.C. 5:94-7.2(b)." The DCA argues this satisfies the federal requirement for a fair return on investment. 24 C.F.R. § 92.254(a)(5)(i).

The DCA argues as well that the "recapture provisions are also in line with the minimum federal requirements" for determining recapture price, which "'ensure that the participating jurisdiction recoups all or a portion of the HOME assistance to the homebuyers' if sold within the affordability period." 24 C.F.R. § 92.254(a)(5)(ii). The federal regulations provide that recapture provisions must also "ensure that the participating jurisdiction recoups all or a portion of the HOME assistance to the homebuyers," and that the recapture amount "cannot exceed the net proceeds" of the unit, which is calculated as "sales price minus superior loan repayment . . . and any closing costs." 24 C.F.R. § 92.254(a)(5)(ii)(A).

Prior to occupying the home, each resident was required to execute a recapture note on their property for $177,500. The DCA explains that this figure represents the "ceiling of what can be recaptured" by the DCA at resale. See N.J.A.C. 5:80-26.5(c). Contrary to the residents' argument, the federal regulations do not necessarily require the adoption of the requested terms. See 42 U.S.C. § 12704(10); 24 C.F.R. § 92.254(a)(5)(i) to (ii).

The residents argue 42 U.S.C. § 12745(b) "clearly states that the affordability restrictions on a HOME unit must either restrict the price upon resale or provide for recapture of the subsidy." The residents argue the statute does not authorize restrictions on both resale price and recapture.

In reviewing the plain language of the statute, it is not ambiguous as to whether the restrictions are mutually exclusive. See Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012). The statute provides that "[h]ousing that is for homeownership shall qualify as affordable housing under this subchapter only if the housing": (1) is listed at the required initial purchase price, (2) is purchased by a buyer who qualifies as part of a low-income family, (3) "is subject to resale restrictions that are established by the participating jurisdiction and determined by the Secretary to be appropriate to" (A) allow only a low-income family to make the subsequent purchase "or" (B) allow for recapture;

and (4) meets efficiency standards applicable to new construction. 42 U.S.C. § 12745(b)(1) to (4). Subsection (3) represents the minimum requirements for resale restrictions, only one of which is needed for the home to qualify as affordable housing as indicated by use of the word "or." See 42 U.S.C. § 12745(b)(3)(A) to (B). That the legislature intended to allow for more than one resale restriction is further supported by the use of the plural form "resale restrictions." See ibid. The residents' argument is not persuasive.

The residents reiterate the argument that the DCA imposed an arbitrary recapture requirement. The residents point again to the recapture provision language of subsection (3)(A), which provides that a home will qualify as affordable housing only if it is subject to resale restrictions that allow for subsequent purchase by a low-income family and (3)(B), which states that recapture is available, "except where there are no net proceeds or where the net proceeds are insufficient to repay the full amount of the assistance." 42 U.S.C. § 12745(b)(3)(A)-(B) (emphasis added).

Contrary to the residents' argument, the statute's plain language does not indicate mutual exclusivity between a recapture provision and an affordable resale price. See ibid. Therefore, the residents' argument that the DCA's resale

21

requirements were contrary to federal law because the recapture provision was onerous is not persuasive.

### V. DCA Erred in Denying the Residents' Requests to Modify the Deed Restrictions Without a Hearing in Light of the Particular Circumstances of the Redevelopment Project.

The residents argue that if this court finds the DCA did not violate the APA or misinterpret 42 U.S.C. § 12745(b), the DCA's decision to deny their request to modify the deed restrictions without a hearing "was arbitrary, capricious, and contrary to public interest."

The residents argue the DCA has the authority to waive the application of regulations under the waiver provision applicable to the HMFA, which provides:

> Any party desiring a waiver or release from the express provisions of any of the regulations in this chapter may submit a written request to the [a]gency to the attention of the [e]xecutive [d]irector. Waivers <u>may be granted</u> only by the [a]gency [b]oard when such waiver would not contravene the provisions of N.J.S.A. 55:14K-1 [to -93] and upon a finding that, in granting the waiver, the [b]oard will be promoting the statutory purposes of the [a]gency.
>
> [N.J.A.C. 5:80–19.1 (emphasis added).]

The residents explain how the DCA's decision has resulted in undue hardship:

> The [r]esidents are not first-time homebuyers seeking a subsidy to enable them to purchase the property; rather,

they are homeowners who were required to give up their unrestricted homes in exchange for the HOME [u]nits. As a result of the specific financing [arrangement] for the Mount Holly Gardens redevelopment project, their initial purchase price was calculated in an unusual manner, based upon the [d]eveloper's ability to obtain outside funding for the redevelopment project.

Because of the settlement agreement's resale restrictions to individuals with household income below eighty percent AMI, the residents argue they "had no reason to anticipate, in light of the express language of UHAC exempting HOME units, that the more stringent requirements of UHAC would govern the transaction."

The residents argue the HOME statute does not require the units to be "set-aside for households at or below [fifty percent] of AMI." They are seeking to be treated "in a manner comparable to similarly situated Gardens homeowners," noting the disparity between them and those assigned to units funded by CHOICE. The October 2019 DCA letter seeking approval from HUD to make the changes requested by the residents, lends weight to their equitable arguments.

VI. DCA Erred in Denying Appellants' Request For a Hearing.

The residents, relying on Bouie v. New Jersey Dept. of Comm. Affairs, 407 N.J. Super. 518, 535 (App. Div. 2009), argue the facts present a contested case

23

appropriate for transfer to the OAL. While the APA "does not create a substantive right to an administrative hearing," In re Fanelli, 174 N.J. 165, 172 (2002), "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice." N.J.S.A. 52:14B-9(a).

In Bouie, we addressed a situation involving a "dispute over the termination of appellant's Section 8 benefits" and held that such a dispute "involve[d] contested adjudicative facts that require[d] an evidentiary hearing to resolve." 407 N.J. Super. at 536 (emphasis added). The residents seek to require the DCA to modify resale restrictions, arguing the unnecessarily stringent restrictions defeat the HOME requirement of a fair return on the property. See 24 C.F.R. § 92.254(a)(5)(i). The proper sales price of the properties and what constitutes a "fair return" are contested factual issues.

The residents also argue that "procedural fairness" requires an opportunity to present their case. The residents rely on In re the Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 383-84 (2013) to argue that when an agency is deemed to be acting in a "quasi-judicial" capacity, "fundamental fairness" requires a hearing. Our Supreme Court in Quest noted, that "[i]f the matter centers on the resolution of disputed adjudicative facts, if the parties are adverse, or if credibility determinations must be made, more

24

formal adjudicatory-type proceedings must be provided." Id. at 384. Here, fundamental fairness and administrative due process require a hearing because a dispute exists as to whether the restrictions comply with federal regulations. "In a contested case, all parties shall be afforded an opportunity for a hearing after reasonable notice." N.J.S.A. 52:14B-9(a).

In these highly unusual circumstances, the residents are parties. Ordinarily there are "no pre-determined purchasers of units created through the HOME program, so there would be no directly affected parties other than the [d]eveloper." Here, however, where the residents traded their homes, the purchase price is open to dispute, as is the "fair return" HOME requirement. We thus remand for a plenary hearing.

Reversed and remanded to the OAL for a contested hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION