**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4962-18T2

ELAN PHARMACEUTICALS,
INC.,

      Plaintiff-Appellant,

v.

DIRECTOR, DIVISION OF
TAXATION,

      Defendant-Respondent.

_____

Argued November 12, 2020 – Decided January 26, 2021

Before Judges Alvarez and Geiger.

On appeal from the Tax Court of New Jersey, Docket No. 10589-2010.

Alysse McLoughlin, argued the cause for appellant (McDermott Will & Emery LLP, and Charles J. Moll III, (McDermott Will & Emery LLP) of the California Bar, admitted pro hac vice, attorneys; Charles J. Moll III, of counsel; Alysse McLoughlin, on the briefs).

Michael J. Duffy, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel; Michael J. Duffy, on the brief).

PER CURIAM

Plaintiff Elan Pharmaceuticals, Inc. (Elan), appeals from a May 2, 2014 Tax Court order and June 6, 2019 final judgment determining: (1) the Director of the Division of Taxation (Division) properly reclassified the gain from Elan's sale of its ABELCET and PERMAX assets from non-operational income to taxable apportionable operational income; and (2) that Elan owed $966,127.38 in corporate taxes for tax year 2002, a $96,612.74 penalty, and $2,291,918.08 in interest.[1] Elan contends that the Tax Court erred in determining that the business liquidation doctrine did not apply to the gain from the sale of the ABELCET and PERMAX assets. In the alternative, Elan argues this matter should be remanded to the Tax Court for further fact-finding on this issue. We affirm.

Because this case was decided "on cross-motions for summary judgment, we will rely on the core material facts that informed the Tax Court's decision." McKesson Water Prods. Co. v. Dir., Div. of Taxation, 408 N.J. Super. 213, 215 (App. Div. 2009).

---

[1] The Tax Court also found that the Division improperly excluded receipts from Elan's 2002 fractional denominator but that finding was not appealed.

A-4962-18T2

In 2002, Elan was a Delaware company with its corporate headquarters and principal place of business in California. Elan was wholly owned by Athena Neurosciences, Inc. (Athena). Athena was wholly owned by Elan Holdings. Ltd., which in turn was wholly owned by Elan Corporation, PLC (Elan PLC), a multi-national pharmaceutical company with its principal place of business in Ireland. A document titled "Certain Material Transactions Elan PLC and affiliates 1996-2005" lists more than fifty acquisitions, divestments, and other transactions undertaken by Elan PLC between 1996 and 2005.

Elan PLC executive William Daniel described Elan as "a neuroscience-based technology company . . . divided into three separate business segments: neurology, autoimmune disease and severe pain management." (Pa46). Daniel explained that "[e]ach segment focused on discovering, developing, manufacturing and marketing advanced therapies in its respective field."

In May 2000, Elan PLC acquired The Liposome Company (TLC), a Delaware corporation with its principal place of business in New Jersey. At some point after the acquisition, Elan PLC merged TLC into Elan. The acquisition of TLC marked Elan PLC's entry into the field of oncology, with TLC and its subsidiaries producing ABELCET and MYOCET, which Daniel characterized as oncology drugs. It also developed several other oncology

drugs. A power point presentation prepared for Elan PLC's board of directors stated that ABELCET is used to treat "severe systemic fungal infection." The presentation's overview asserted that ABELCET can be used to treat patients with cancer, AIDS, or those who have received organ transplants.[2]

As a result of the merger, Elan acquired the TLC subsidiary which manufactured ABELCET and MYOCET, and renamed it Elan Operations, Inc. Elan Operations was headquartered in Indiana. Elan also acquired the TLC subsidiary which held the license to sell ABELCET in Canada (Canada ABELCET Business) and renamed it Elan Canada, Inc. Elan conducted the sale of ABELCET in the United States (U.S. ABELCET Business), while the rights to sell ABELCET and MYOCET in the European Union (EU ABELCET Business) and the rights to sell ABELCET in Asia (Asia ABELCET Business) were transferred to Elan Pharma International Ltd. (EPIL), an Elan PLC subsidiary and foreign corporation with no business dealings in the United States.

Daniel certified that following TLC's acquisition, its senior management in New Jersey "departed Elan's employ and were replaced with Elan [PLC] and

---

[2] In contrast, the drugs characterized in the power point presentation as in the pipeline were exclusively for cancer patients.

Elan management personnel" from the companies' respective headquarters in California and Ireland. However, following Elan's sale of the U.S. ABELCET Business, an interim services agreement provided that access to Elan's facility in Princeton would be provided "as reasonably requested."

According to Daniel, Elan PLC suffered financial distress in 2002 and adopted a plan "to shed non-core businesses, and to raise money to reduce debt owed to its outside lenders." While the U.S. and Canada ABELCET Businesses were profitable, the EU ABELCET Business was not, and Elan PLC was advised to sell the U.S. and Canada ABELCET Businesses separately from the EU ABELCET Business "[t]o avoid delay." The Division points out an offering memorandum prepared by Morgan Stanley that states "Elan prefers to sell the U.S. and Canadian rights to [ABELCET]. . . [but] plans to retain the rights to [ABELCET] outside of the U.S. and Canada."

In November 2002, Elan, Elan Canada, and Elan Operations sold the U.S. and Canada ABELCET Businesses to Enzon Pharmaceuticals (Enzon) for $360 million (the Enzon transaction). The Enzon transaction included the sale of "business operations, including manufacturing, commercial infrastructure, sales force, intellectual property and clinical studies." Elan PLC's 2002 annual report describes the Enzon transaction as also including "any Japanese rights to

5

[ABELCET]." The report states "Elan retains its existing rights to market [ABELCET] in territories outside of the United States, Canada and Japan."

The Enzon transaction also included an interim services agreement between Elan, Elan Canada and Enzon, which, among other terms, allowed for the continued sale of MYOCET in Canada, with Elan and Enzon to share in the revenue. Under a license agreement between Enzon and Elan, Elan retained intellectual property rights to ABELCET but granted Enzon a license to use ABELCET's intellectual property "to develop, . . . market, sell, . . . and import" the drug. The parties also exchanged reciprocal licenses to use ABELCET in connection with clinical trial and research and development activities "undertaken or to be undertaken" by either party in their respective territories. Elan maintains it did not retain intellectual property rights to ABELCET, pointing to Daniel's certification.

Enzon thereafter entered into a long-term agreement with EPIL to supply it with ABELCET while it was still operating the EU ABELCET Business. This agreement resulted in more than $16 million in revenue during 2003. Eventually, in February 2004, the EU and Asia ABELCET Businesses, along with the rights to sell MYOCET in the EU, were sold to Medeus UK Ltd. (the Medeus transaction). The Medeus transaction also included shares of subsidiary

businesses licensed to sell ABELCET and MYOCET in individual European countries.

Daniel certified that the proceeds from the Enzon transaction were distributed to Athena Neurosciences in three payments: $155 million in December 2002; $183 million on June 2003; $22 million on November 2003. Athena Neurosciences then transferred the proceeds to Elan PLC to reduce corporate debt. An unidentified ledger reflected that $338,208,000 of ABELCET proceeds were received on November 22, 2002, the date of the Enzon transaction. The ledger also shows a $12,657,287 "[i]ntercompany payment" was made to EIS on November 26, 2002. A $760,000 "[i]ntercompany payment" was made to Athlone on December 9, 2002. Other December intercompany payments include approximately $14.8 million paid to ETT, approximately $20.8 million paid to EPIL, and approximately $131.3 million paid to EPIL "(on behalf of ANI)."

The ledger further shows a February 2003 "[i]ntercompany payment" of approximately $96.4 million "from EPIL out of [ABELCET] proceeds." March 2003 transactions included an "[i]ntercompany payment to ETT" of approximately $6 million, an "[i]ntercompany payment to EPIL" of approximately $8.5 million, a "[r]etrospective reimbursement of qualifying

A-4962-18T2

spend by [Elan]" of approximately $7 million, a "loan repayment to ANI/EPIL" of approximately $22.2 million, and a "[r]etrospective reimbursement of [Elan] qualifying reinvestments" of approximately $27.1 million. The ledger shows more transactions in June and November 2003, with $0 "ABELCET cash left in [Elan]" by December 31. A summary of spending reflects approximately $88.8 million spent by Elan directly and approximately $249.4 million "paid to other group companies."

In 2003, Elan PLC and its affiliates earned approximately $16 million attributable to ABELCET in Europe and Asia. This was in addition to its earnings attributable to MYOCET. Despite these earnings, Elan PLC continued with its recovery plan. As part of its plan, the Elan Group was reorganized into Core Elan and Elan Enterprises, with Core Elan engaging in commercial activities related to neurology, pain management, and infectious diseases, and Elan Enterprises attempting to liquidate the drug delivery ventures and non-core pharmaceutical products. Elan claimed that each of its "core" operations of neurology, autoimmune diseases, and severe pain management constituted a distinct business segment, with minimal interaction between each.

Elan's 2002 annual statement listed ABELCET as one of the products "divested" from its infectious disease operation. Also sold was Athena

Diagnostics, Inc., one of Elan's subsidiaries that focused on neurological diagnostics.

In December 2003, Elan PLC, Elan, Epil, and other entities entered into an agreement to sell "the European Specialities Pharmaceutical Business of Elan" to Medeus UK Ltd. The products sold included ABELCET and MYOCET. Also included were the intellectual property rights with license agreements and contracts acquired by Elan when Elan PLC purchased Liposome; "the October 2002 ABELCET purchase agreement; the November 2002 Supply Agreements; and the November 2002 License Agreement." The trademarks for ABELCET were, however, subject to a license back to Elan Group to continue labeling and packaging ABELCET. Moreover, Elan was identified as the "proprietor" of the intellectual property rights in ABELCET and MYOCET.

On its 2002 corporation business tax (CBT) return, Elan reduced its taxable federal net income, including the gain from the Enzon sale, by $340,332,168, reporting it as nonoperational income. In contrast, Athena reported about 26% of this income as apportionable, operational income on its consolidated California corporate income tax return.

The Division's audit determined that the gain from the Enzon sale was apportionable, taxable income since Elan did not allocate the entire income to California and the sale did not "meet the criteria allowing for the business liquidation exception." The Director upheld the audit results and noted that if a court determined the gain was nonoperational income, Elan would be assessed for "recapture [of] prior expenses on disposed assets."

On July 6, 2010, Elan initiated this action challenging the $1,560,546.50 tax assessment imposed by the Division following its audit of Elan's 2002 CBT return, and an April 8, 2010 final determination that Elan misclassified the gain from the sale of its ABELCET and PERMAX drug businesses. The complaint also contested an audit adjustment relating to Elan's sales in "states in which Elan was not taxable."

Following the completion of discovery, the parties cross-moved for partial summary judgment regarding the Director's reclassification of the gain from the sale of ABELCET (the ABELCET gain) as apportionable operational income.

Although Elan claimed it did not retain any portion of the sale proceeds or use the proceeds for payment of its business operations, the Director pointed to a document titled "[ABELCET] Proceeds received November 22, 2002," that Elan provided during discovery, as evidence that Elan distributed a portion of

A-4962-18T2

the proceeds to the group's affiliates other than Athena. Elan contended the document was irrelevant and, in any case, merely demonstrated that it distributed the ABELCET sale proceeds.

The court issued a May 2, 2014 order and twenty-seven-page letter opinion granting partial summary judgment to the Director and denying partial summary judgment to Elan, finding the Director correctly reclassified the ABELCET gain as operational income under N.J.S.A. 54:10A-6.1(a).

The court made the following findings. ABELCET is a proprietary drug "marketed world-wide for treating severe, systemic fungal infections in cancer, AIDS or transplants patients who were intolerant to conventional therapy." "Enzon paid about $360 million (adjusted) in cash for the purchase of the ABELCET product line. For purposes of tax reporting[,] . . . $338 million was allocated to [Elan,] representing payments for intellectual property and personnel and $22 million was allocated to Elan Operations, Inc., representing payments for real/personnel property including inventory. No portion of the proceeds was allocated to Elan Canada, Inc." (Footnote omitted).

The court determined that the issue was "whether the gain of about $360 million from the sale of the U.S. and Canadian markets for . . . ABELCET, administered primarily to cancer patients, along with the drug's New Jersey

A-4962-18T2

manufacturing facility, is operational income subject to apportionment and to [CBT] in New Jersey."  The court found that "[t]he material facts as to the acquisition and disposition of the U.S. and Canadian ABELCET business lines are undisputed."  Therefore, summary judgment was appropriate since only legal issues remained.

The court noted that N.J.S.A. 54:10A-6.1(a) was amended effective January 1, 2002, to heighten the taxpayer's burden of proof to clear and convincing evidence and to avoid "a significant part of the nonoperational income of New Jersey headquartered companies [escaping] taxation."  Assembly Budget Comm. Statement to A. 2501 4-5 (June 27, 2002).  As amended, N.J.S.A. 54:10A-6.1(a) defines "operational income" as follows:

> "Operational income" subject to allocation to New Jersey means income from tangible and intangible property if the acquisition, management, or disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations and includes investment income serving an operational function.

The statute then defines "nonoperational income" by way of exclusion:

> Income that a taxpayer demonstrates with clear and convincing evidence is not operational income is classified as nonoperational income, and the nonoperational income of taxpayers is not subject to allocation but shall be specifically assigned; provided, that 100% of the nonoperational income of a taxpayer

12

that has its principal place from which the trade or business of the taxpayer is directed or managed in this State shall be specifically assigned to this State to the extent permitted under the Constitution and statutes of the United States.

[N.J.S.A. 54:10A-6.1(a).]

The court then discussed the liquidation exception. "Where the sales have constituted liquidations or partial liquidations of a business, and the sale proceeds have not been reinvested in the business, the courts [other than in in California] uniformly have held . . . that the sale proceeds were nonbusiness income." McKesson Water Prods. Co. v. Dir., Div. of Taxation, 23 N.J. Tax 449, 457 (Tax 2007), aff'd, 408 N.J. Super. 213 (App. Div. 2009). The court distinguished McKesson, noting:

> Here, neither party contends that there are factual issues as to whether the Elan Group, including [Elan], was engaged in a unitary business. Neither party [had] argued that the U.S. and Canadian ABELCET business line is not unitary. Thus, the "property" sold, here the tangible and intangible assets associated with the ABELCET product line, is the property or assets employed in a unitary business, part of which was operating in New Jersey.

The court also stated that "this case does not involve an [Internal Revenue Code] § 338(h)(l0) sale" and, "in McKesson, the [p]arent [company] was involved in

one business line (pharmaceutical) and its subsidiary was involved in a completely distinct business (selling bottled water)."

The court then engaged in the following analysis of the facts under the functional test imposed by N.J.S.A. 54:10A-6.l(a):

> ABELCET and its intellectual property rights were tangible and intangible property; the same were acquired, managed, employed by, and integral to, [Elan's] and the corporate group's regular trade or business of being a world-wide fully integrated pharmaceutical company; and the same earned significant income in the course of [Elan's] and Elan group's regular trade or business as a world-wide fully integrated pharmaceutical corporation.
>
> It would logically follow that the disposition of the tangible properly (inventory of ABELCET and its raw materials; the machinery/equipment in Indiana which made ABELCET) and intangible property (patents, know-how, trade-marks, distribution rights, licenses, all of which were treated as income generating capital assets) should produce operational income. This is especially true where it is undisputed that the reason for the sale of ABELCET was so that the Elan group would reduce its debt, thus, allow it to continue to remain in business which was facing a downturn. ABELCET, as the most profitable drug in the most viable commercial market (the U.S.), with an assured market due to increasing number of patients with compromised or weakened immune systems (such as AIDS or cancer patients), would raise the maximal and quickest revenue. Thus, the sale of the U.S. and Canadian ABELCET markets was clearly for the benefit of the Elan group, including [Elan], and for their continuance, in and of, their unitary business.

14

In accordance with <u>McKesson</u>, the court held that "income from disposition of a capital asset is not apportionable if it is earned in a liquidation context." It is only when there is "a complete 'cessation of' the subsidiary's business due to the sale of all of its stock/assets . . . [that] the resultant income is not operational especially where the sale proceeds were not re-invested in a 'similar business.'" (quoting <u>McKesson</u>, 23 N.J. Tax at 465). The court concluded that the liquidation exception is to be narrowly construed and must be "carefully scrutinized when being applied to the sale of capital assets which were unquestionably acquired and employed by the taxpayer such that the asset[s] were 'integral parts of the taxpayer's regular trade or business operations.'" (quoting <u>McKesson</u>, 23 N.J. Tax at 465).

Applying those principles, the court found:

> [N]either [Elan] nor the Elan group completely ceased doing its pharmaceutical business after the November 2002 sale of the U.S./Canadian markets for the ABELCET product line. Neither [Elan] nor any of its or [Elan PLC's] subsidiaries closed their respective shutters. Indeed, they continued as before, except that as to the ABELCET product line, their world-wide pharmaceutical business continued outside of the geographical areas of U.S. and Canada. However, even as to these two geographical areas, [Elan] retained the rights to use ABELCET or its improvements in connection with any R&D activities conducted by [Elan] or its affiliates under a license agreement with

15

A-4962-18T2

Enzon. Although [Elan] claims that it had nothing to do with EPIL's sales of ABELCET abroad, the undisputed fact is that [Elan] continued to be the legal owner of the drug and the intellectual property rights in the drug. The business reasons (cost/time savings) for providing only distribution rights to EPIL cannot subvert the fact, and thus, the conclusion, that [Elan] continued to operate its pharmaceutical business, including the ABELCET product line outside the U.S. and in a restricted manner within the U.S.

Further, several agreements were effectuated with Enzon which allowed [Elan] and the Elan group to continue to benefit from, and use, the ABELCET product and assets. This was in contrast to another 2002 divested product line, [PERMAX], which [Elan] sold to an unrelated company as part of its recovery plan, and as to which there were no supply agreements or other business arrangements since the group "divested . . . interest completely and retained no role or interest in the drug going forward," per [Elan PLC's] employee's deposition.

The above reasons also render unpersuasive [Elan's] arguments that it was liquidating its and [Elan PLC's] (or [Elan PLC's] group's) "oncology" line of business. While ABELCET was directed to a market comprising of physicians or surgeons, and/or hospitals for ultimate use by mostly cancer patients, it was also targeted to similarly vulnerable patients such as those with AIDS. ABELCET was also viewed as used in the therapeutic areas of "infectious diseases" such as "fungal infections" as described in [Elan PLC's] 2003 annual report. Nonetheless, whether ABELCET was viewed as a cancer or oncology drug or an anti-fungal medication, the above facts show that the sale of its U.S. and Canadian market was not a final closure or liquidation of [Elan] or [Elan PLC's] "oncology

16

business." [Elan] and [Elan PLC's] affiliates continued to research[,] develop, manufacture, market, license, and/or distribute MYOCET, which had as its target audience, patients with metastatic breast cancer. The group also continued to enter into joint ventures with other corporate entities in the cancer treatment area, such as . . . Chemagenix Therapeutics, Inc.

[(footnote omitted).]

The court rejected Elan's contention that the sale of ABELCET, its "most profitable revenue source," to reduce Elan group's debt, "require[d] a conclusion that the group ended its oncology business for purposes of applying the liquidation exception of the functional test." The court was also unpersuaded by Elan's "claims that because [Elan PLC] separated its business activities into two distinct groups, and further identified three or four distinct therapeutic areas, each area was a distinct business division or segment for purposes of applying the liquidation exception." The court concluded that dividing operations into different divisions or segments "does not alter the fact that [Elan PLC] with its group held itself out to be a fully integrated, world-wide pharmaceutical company in the business of providing various medications, whether through its own R&D efforts, or by acquisition of other similar companies with established medical drug products and markets."

17

The court likewise rejected Elan's contention that <u>McKesson</u> applies because it "sold a geographic segment of a product line." The court distinguished the out-of-state cases cited by <u>McKesson</u> on several grounds. In particular, the court noted:

> Further, the sale involved an anti-competition undertaking whereby the Elan group (including [Elan]) and buyer agreed not to sell, market, or distribute ABELCET outside of their respective permitted geographical regions for a [ten]-year period. Such clause would appear to acknowledge that Plaintiff, [Elan PLC] and the Elan group continued in the same competitive pharmaceutical market with ABELCET is one of the primary products over, and as to which the Elan group still had rights, thus, belying a "complete" liquidation of [Elan], [Elan PLC's,] or the Elan group's trade or business.

The court also found that Elan's 2002 CBT return does not reflect that "the sale proceeds were fully distributed by [Elan] to Athena, its sole stockholder." Nor does the return reflect that "the $155 million approved to be paid as dividends" were distributed to Athena. On the contrary, Schedule C-1 of the return "showed zero distributions."

The court also rejected Elan's claim that it made installment distributions to maintain adequate cash reserves to address any indemnification obligations owed to Enzon, noting its 2002 CBT did not reflect any "appropriated retained earnings."

18

Finally, the court was not persuaded by "[Elan's] claim that it used the sale proceeds to pay monies on behalf of Athena." The court found that "EPIL, one of the recipients of the ABELCET sale proceeds, was neither [Elan's] nor Athena's subsidiary or stockholder. EPIL was not a party to the October 2002 Asset Agreement yet paid [Elan] about $96 million 'out of the ABELCET[] proceeds.'" In addition, Elan "did not designate the payment of about $15 million to EPIL as being made 'on behalf of' Athena."

Elan then moved for reconsideration on three grounds. First, it claimed that the court erred by assuming that Elan's business and operations were unitary with its Irish parent company, and if it did, an evidentiary hearing was required. Second, it claimed the court misapplied the holding in McKesson that cessation of a line of business is non-operational income. Third, it claimed that the use of the sale proceeds was irrelevant as a matter of law.

The court issued an October 3, 2014 order and eleven-page letter opinion denying reconsideration and "affirming" its prior order. The court explained:

> The CBT taxes operational income[,] . . . includ[ing] income "from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations and includes investment income serving an operational function." N.J.S.A. 54:10A-6.1(a). A taxpayer is required to demonstrate by "clear and convincing"

19

> evidence that income is "nonoperational." <u>Ibid.</u> However, if a taxpayer's principal place [of busines]s from which it directs or manages its trade or business is New Jersey, then 100% of such nonoperational income is allocable to, and thus taxed by, New Jersey (subject to the Constitution or federal laws).

The court rejected Elan's contention that it had improperly distinguished <u>McKesson</u>, noting that the sale of the ABELCET line of business was not the same as [the] complete liquidation of the subsidiary in <u>McKesson</u>. Further, "[w]hen [Elan] (along with its parent and subsidiaries) sold the proprietary rights in and to ABELCET (for the U.S. and Canadian markets)," the stock did not cease to exist. "[T]he transaction in <u>McKesson</u> ended the subsidiary's existence whereas here, no corporate extinction took place."

The court also rejected the premise that a partial liquidation mandates application of the liquidation exception. It also found that the cases relied upon by Elan, which "did not involve or contemplate the sale of intangible intellectual property or a seller's post-sale retention of those rights," were inapplicable to the facts in this case.

The court noted that the "material facts as to the acquisition and disposition of the U.S. and Canadian ABELCET business lines were undisputed." The court thus found "the legal standards for analysis of a unitary business were not relevant and[,] therefore, not discussed or applied." The court

recognized that it erred when it stated that ABELCET was manufactured in New Jersey but concluded the error was harmless since "the correct location of the manufacturing facility was recited in the factual and analytical portions of the opinion."

The court rejected Elan's claim that it misinterpreted the facts. The opinion "recited that EPIL was licensed [by Elan] to sell ABELCET abroad"; "the European subsidiaries were created by [Elan PLC] to market/ sell ABELCET abroad but were reflected as [Elan's] subsidiaries in a corporate chart provided by [Elan]; and EPIL distributed/sold ABELCET to those subsidiaries." "Further, the court noted that [Elan] always remained the owner and proprietor of ABELCET, even when sold in the European markets, a fact borne by the documents submitted by [Elan] in support of its summary judgment motion."

Elan also argued that the court erred by stating that its subsidiary, Elan Canada, Inc., "did not exit the [ABELCET] market." Elan argued that the interim sales agreement did not evidence Elan's continued operations; rather it showed only a continuation of "administrative activities" by a liquidating taxpayer. The court disagreed, noting that its recitation of the facts relating to the sale to Enzon correctly pointed out "that Elan Canada, Inc. was a party to

the transaction and that Enzon purchased the ABELCET assets (drug manufacturing plus intangible rights) in the Canadian market."

Last, Elan argued the court should have denied summary judgment because its findings regarding distribution of the ABELCET sale proceeds were based upon "an undated worksheet, prepared by an unknown author." The worksheet was produced by Elan in response to the Division's discovery requests. Moreover, Elan's position was belied by its 2002 CBT returns. In any event, the court decided "that the sale of the U.S. and Canadian markets for ABELCET did not merit a liquidation exception based on the facts." Therefore, "an analysis of the distribution of the sale proceeds [was] unnecessary."

At some point not disclosed by the record, the parties cross-moved for partial summary judgment regarding the sales fraction denominator exclusion issue, and the court granted partial summary judgment in favor of Elan. The Division has not appealed that decision.

On June 6, 2019, the court issued a final judgment declaring that the gain recognized by Elan in 2002 from the sale of its PERMAX drug assets (the PERMAX gain) also constituted operational income under N.J.S.A. 54:10A-6.1(a). The judgment noted that the parties stipulated to the following facts:

> a) [PERMAX] was a drug in [p]laintiff's therapeutic area of neurology;

b) Plaintiff sold its [PERMAX] product line as part of the 2002 recovery plan;

c) Plaintiff continued in the pharmaceutical business following the [PERMAX] sale, and continued in the therapeutic area of neurology; and

d) With respect to determining whether the [PERMAX] Gain is operational or nonoperational income, all other relevant facts concerning the [PERMAX] Issue are the same as the relevant facts concerning the ABELCET Issue[.]

Accordingly, the Tax Court found the gain from the sale of the ABELCET and PERMAX assets presented an identical legal issue.

The judgment fixed Elan's 2002 outstanding corporate tax liability at $3,354,658.20, including interest and penalty. The Tax Court stayed its order pending appeal but noted that interest continued to accrue at the rate specified in N.J.S.A. 54:49-3. This appeal followed.

Elan focuses its arguments on its sale of the ABELCET assets and raises the following points for our consideration:

POINT I

THE TAX COURT'S DETERMINATION THAT THE ELAN [ABELCET] DISPOSITION RESULTED IN OPERATIONAL INCOME IS REVERSIBLE ERROR.

A. The Elan [ABELCET] Disposition Satisfies the Business Liquidation Doctrine and is, accordingly, Nonoperational Income.

    1. The Elan [ABELCET] Disposition is the Liquidation of a Separate and Distinct Business Segment.

        i. The Elan [ABELCET] Disposition is the Liquidation of Elan's Entire Oncology Business Segment.

        ii. Alternatively, the Elan [ABELCET] Disposition is the Partial Liquidation of a Geographic Segment of a Worldwide Oncology Business.

    2. The Tax Court's Errors in Determining that the Elan [ABELCET] Disposition Did Not Constitute a Liquidation for Purposes of the Business Liquidation Doctrine.

        i. That the Elan [ABELCET] Disposition Included the Sale of Intangible Intellectual Property is Irrelevant.

        ii. The Post-Sale Retention of the EU [ABELCET] Distribution Rights by Elan's Affiliates is Also Irrelevant Here.

    3. The Proceeds from the Elan [ABELCET] Disposition Were Distributed to Elan's Parent and Not Invested in the Same Type of Business as Had Been Sold.

B. Any Implication That Plaintiff Was Involved in the Conduct of a Unitary Business with Respect to its

24

Operation of the [U.S.] [ABELCET] Business Is Irrelevant.

C. The Court Erroneously Concluded That Plaintiff's Sale of [ABELCET] Did Not Satisfy the Business Liquidation Doctrine Based on the Fact that the Assets Sold Were Used in the Business.

D. It is Irrelevant Whether Elan was Engaged in a Different Line of Business Than its Affiliates.

POINT II

ALTERNATIVELY, MATERIAL ISSUES OF FACT PRECLUDE THE ISSUANCE OF PARTIAL SUMMARY JUDGMENT FOR DEFENDANT AND REQUIRE THAT THIS COURT REMAND THIS CASE FOR ADDITIONAL FACT FINDING.

A. The Errors to be Corrected.

1. Elan's [U.S.] [ABELCET] Business Operations Were Not Part of a Unitary Business with Other Operations Conducted by Elan or Any of Its Affiliates.

2. [ABELCET] Did Not Operate as a Separate and Independent Oncology Business Segment.

3. Elan Liquidated Its [ABELCET] Oncology Business Segment in the 2002 Sale to Enzon Pharmaceuticals.

4. The [ABELCET] Business Was Not Integrated with Elan's Severe Pain Management Business.

5. Elan's Proceeds from the 2002 Liquidation of the [U.S.] [ABELCET] Business Was Distributed by Elan to [Elan PLC].

6. The EU [ABELCET] Business Was Unrelated to Plaintiff, and Was Operated by EPIL.

7. The [U.S.] [ABELCET] Business Was Managed Outside of New Jersey.

8. Both the United States and Canada [ABELCET] Businesses Were Terminated in 2002.

B. The Contested Factors Listed Above Preclude Granting of Summary Judgment for Defendant.

We begin by recognizing several well-established principles. "A taxpayer challenging the Director's determination bears the burden of proof." UPSCO v. Dir., Div. of Taxation, 430 N.J. Super. 1, 8 (App. Div. 2013) (citing Atl. City Transp. Co. v. Dir., Div. of Taxation, 12 N.J. 130, 146 (1953)).

We apply "a presumption of correctness" to the Director's decision "in light of the Director's expertise." Est. of Taylor v. Dir., Div. of Taxation, 422 N.J. Super. 336, 341 (App. Div. 2011) (citation omitted). "That is particularly true when the Director's expertise is exercised in the 'specialized and complex area' of the tax statutes." Ibid. (quoting Metromedia v. Dir., Div. of Taxation, 97 N.J. 313, 327 (1984)). Where the issue is strictly legal, we afford no deference to the

Director's statutory interpretations and review de novo. Amer. Fire & Cas. Co. v. Dir., Div. of Taxation, 189 N.J. 65, 79 (2006).

In turn, our scope of review of a decision by the Tax Court is limited and deferential. Est. of Taylor, 422 N.J. Super. at 341. Because the Tax Court has "special expertise," its findings will not be disturbed unless they are arbitrary or lack substantial evidential support in the record. Yilmaz, Inc. v. Dir., Div. of Taxation, 390 N.J. Super. 435, 443 (App. Div. 2007). We review the Tax Court's legal determinations de novo. Alcatel-Lucent USA Inc. v. Twp. of Berkeley Heights, 460 N.J. Super. 243, 249 (App. Div. 2019).

We review the Director's motion for partial summary judgment using the same standard applied by the Tax Court—"whether, after reviewing 'the competent evidential materials submitted by the parties' in the light most favorable to [plaintiff], 'there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Because we review the Tax Court's grant of partial summary judgment to the Division, our review is de novo. Waksal v. Dir., Div. of Taxation, 215 N.J. 224, 231-32 (2013).

Applying these principles, we affirm substantially for the reasons expressed by Tax Court Judge Mala Sundar in her comprehensive and well-reasoned May 2 and October 3, 2014 letter opinions. We add the following comments.

"The definitions of operational and nonoperational income in N.J.S.A. 54:10A-6.1 appear to have been derived from" the definition of "business" and "nonbusiness" income found in the Uniform Division of Income for Tax Purposes Act, 7 U.L.A. 331 (1985 and 1997 Supp.), commonly referred to as "the functional test." McKesson, 23 N.J. Tax at 454.

McKesson adopted a liquidation exception to the functional test. Id. at 464-65. Under that exception, the gain realized from the sale of assets is nonoperational income where: (1) the sale constitutes a liquidation or partial liquidation of a business ; and (2) the sale proceeds are distributed to shareholders and not reinvested in in the business. See id. at 457.

We agree with the Director's position that Elan's sale of certain ABELCET rights to Enzon in 2002 did not constitute a complete or partial liquidation of Elan's oncology business. Elan continued to own other oncology patents and trademarks following the consummation of the Enzon transaction, including foreign ABELCET patents and trademarks until the 2004 Medeus transaction.

In addition, following the Liposome merger, Elan acquired patents and trademarks to numerous other oncology drugs, including MYOCET. Elan's oncology medication business was clearly comprised of more than just ABELCET. The Enzon transaction did not liquidate Elan's oncology drug business. Instead, the transaction was limited to the sale of its rights to ABELCET in three markets and certain related assets to Enzon. However, "Elan retain[ed] its existing rights to market [ABELCET] in territories outside of the United States, Canada and Japan." Elan PLC continued to earn income from ABELCET after the transaction, earning more than $16 million from ABELCET sales in Europe and Asia in 2003. Moreover, "Elan and Enzon entered into a long-term manufacturing and supply agreement whereby Enzon will continue to manufacture Elan's requirements for" ABELCET and MYOCET. (PA317-18). As accurately observed by the court, Elan and Elan PLC's affiliates "continued to research, develop, manufacture, market, license, and/or distribute MYOCET, which had as its target audience, patients with metastatic breast cancer. The group also continued to enter into joint ventures with other corporate entities in the cancer treatment area . . . ." Elan did not sell its remaining rights to ABELCET until 2004.

We concur with Judge Sundar's conclusion that the revision of Elan group's business strategy to effectuate an increase in revenue by taking steps that included reducing its debt load "by selling a portion of the ABELCET business line, which had been integral to, and regularly employed in[, Elan's] and the Elan group's trade or business, but with retention of some economically valuable intangible rights, thus ensuring continued income to, and corporate presence of, the Elan group," does not mandate an expansive interpretation of the liquidation exception adopted in McKesson.

We are satisfied that Elan did not meet its burden of demonstrating that the gain derived from the sale of the U.S. and Canadian markets for ABELCET was nonoperational income as defined in N.J.S.A. 54:10A-6.1(a). On the contrary, the record amply supports Judge Sundar's analysis and determination that the gain from those sales was taxable operational income.

Lastly, Elan's activities did not fall within the liquidation exception since the 2002 sale proceeds were reinvested in the business rather than being distributed to shareholders. The record demonstrates that the majority of the Enzon transaction proceeds were used to reimburse reinvestment expenditures and to repay a loan owed to Athena and an affiliate. The remainder of the proceeds were paid to other Elan group companies. Gains realized from a sale

30

constitute operational income if reinvested in the business or used to repay outstanding debt. See Texaco Cities Serv. Pipeline Co. v. McGraw, 695 N.E.2d 481, 486-87 (Ill. 1998) (sale of unused pipeline was business income because company remained primarily a pipeline transportation business and the sale proceeds were reinvested in the business); Welded Tube Co. of Am. v. Commonwealth, 515 A.2d 988, 994 (Pa. Cmmw. Ct. 1986) (proceeds from sale of manufacturing facility for use in debt repayment and expansion as part of reorganization were apportionable business income).

In sum, our careful review of the record reveals that, when viewed in the light most favorable to Elan, the undisputed material facts demonstrate that the Director was entitled to partial summary judgment as a matter of law. See R. 4:46-2(c). Judge Sundar's findings are fully supported by substantial credible evidence in the record. Her legal conclusions are sound and consistent with applicable law. Accordingly, we discern no basis to disturb the partial summary judgment granted to the Director.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4962-18T2